Rec# 428
Fee Pd $250
No Summs
1540

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,    :
DEPARTMENT OF ENVIRONMENTAL       :
PROTECTION, STATE OF CONNECTICUT, :
STATE OF MARYLAND, STATE OF       :
NEW JERSEY, and STATE OF NEW YORK, :
                                  :
     Plaintiffs,                 :
                                  :
     v.                          :
                                  :
ALLEGHENY ENERGY, INC.,           :
ALLEGHENY ENERGY SERVICE          :
CORPORATION, ALLEGHENY ENERGY     :
SUPPLY COMPANY, LLC, MONONGAHELA  :
POWER COMPANY, THE POTOMAC EDISON :
COMPANY, and WEST PENN POWER      :
COMPANY,                          :
                                  :
     Defendants.                 :

05  0885

Civil Action No. _____

## COMPLAINT

The Commonwealth of Pennsylvania, Department of Environmental Protection

("Pennsylvania") and the States of Connecticut, Maryland, New Jersey and New York

(collectively with Pennsylvania, the "Plaintiff States"), each represented by, and by authority of,

its respective Attorney General or, in the case of Pennsylvania, the Chief Counsel of its

Department of Environmental Protection, allege:

### NATURE OF THE ACTION

1. The Plaintiff States commence this civil action against Allegheny Energy, Inc. ("Allegheny Energy") and its wholly owned or nearly wholly owned subsidiaries Allegheny Energy Service Corporation ("Allegheny Service"), Allegheny Energy Supply Company, LLC ("Allegheny Supply"), Monongahela Power Company d/b/a Allegheny Power ("Monongahela"), the Potomac Edison Company d/b/a Allegheny Power ("Potomac") and West Penn Power Company d/b/a Allegheny Power ("West Penn") (Allegheny Energy, Allegheny Service, Allegheny Supply, Monongahela, Potomac and West Penn are collectively referred to herein as "Allegheny"). The Plaintiff States bring this action pursuant to 42 U.S.C. § 7604(a) based on Allegheny's construction and operation of modified major emitting facilities without the permits required by the prevention of significant deterioration ("PSD") provisions in Part C of Title I of the Clean Air Act ("CAA" or the "Act"), 42 U.S.C. §§ 7470-7479, and its implementing regulations, including those at 40 C.F.R. § 52.21.

2. In addition, the Commonwealth of Pennsylvania brings this action pursuant to the Pennsylvania Air Pollution Control Act ("APCA"), 35 P.S. § 4001 *et seq.* and its implementing regulations at 25 Pa. Code Subpart C, Article III (related to air resources) based on Allegheny's construction and operation of modified major emitting facilities without the permits required by the PSD and nonattainment new source review ("nonattainment NSR") regulations under Pennsylvania law, 25 Pa. Code, Chapter 127 - Subchapters D & E, respectively.

3. Through its subsidiaries, including defendants Allegheny Service, Allegheny Supply, Monongahela, Potomac and West Penn, defendant Allegheny Energy owns and operates several coal-fired power plants in Pennsylvania, including:

| Plant | Location | Number of Coal-Fired Generating Units | Total Nameplate Capacity for Coal-Fired Units | Date Units Placed into Service |
|---|---|---|---|---|
| Armstrong | Washington Township, Armstrong County | 2 | 326 | 1958, 1959 |
| Hatfield's Ferry | Greene County | 3 | 1,728 | 1969, 1970, 1971 |
| Mitchell | Courtney, Washington County | 1 | 299 | 1963 |

4. At these three plants (the "Facilities"), Allegheny has undertaken capital projects that have had the effect of increasing the plants' emissions. Allegheny undertook many of these construction projects in order to extend the operational lives of the Facilities' electricity generating units at a time when the units at issue were nearing the end of their normal operational lives.

5. At no time did the defendants apply for or obtain the preconstruction permits required under the relevant PSD and/or nonattainment NSR provisions of federal and/or Pennsylvania law. To date, defendants operate the Facilities without applying best available control technology ("BACT") or meeting the lowest achievable emission rate ("LAER") for both sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$"), and without obtaining emission offsets at the Facilities, as required by, respectively, the relevant PSD and nonattainment NSR requirements under federal and/or Pennsylvania law.

6. Emissions of $NO_x$ and $SO_2$ from coal-fired power plants contribute extensively to damages to public health and the environment. The $NO_x$ emissions from these sources contribute to the formation and transport of ozone pollution. In the presence of sunlight, $NO_x$ reacts with volatile organic compounds ("VOCs") in a complicated reaction that leads to the creation of

ozone, a major component of urban smog. Ozone contributes to many respiratory health problems, including chest pains, shortness of breath, coughing, nausea, throat irritation, and increased susceptibility to respiratory infections such as asthma. Elevated ozone levels jeopardize the health of residents of each of the Plaintiff States, especially children, those suffering from respiratory illnesses, and people who work or exercise outdoors. The adverse health effects of ozone pollution are particularly severe in the Plaintiff States, and other northeastern urban areas, where thousands of children suffer the debilitating effects of asthma.

7. The Facilities' emission of ozone-creating pollutants contributes to the formation of ozone in the Plaintiff States. Each of the Plaintiff States suffers from the results of ozone transport, which directly contribute to continued difficulty in attaining and maintaining the National Ambient Air Quality Standards ("NAAQS") for ozone. Air quality modeling demonstrates that much of the ozone in the northeastern states is attributable to transport from power plants in upwind areas. In recognition of this phenomenon, Congress singled out the migration of ozone and its precursors for special emphasis in the 1990 amendments to the CAA:

> The bill reflects an increasing understanding of how ozone pollution is formed and transported. Because ozone is not a local phenomenon but is formed and transported over hundreds of miles and several days, localized control strategies will not be effective in reducing ozone levels.

Senate Report No. 101-228, *reprinted in* 1990 U.S.C.C.A.N. at 3389, 3399.

8. $NO_x$ and $SO_2$ emissions from the Facilities also contribute to the formation of acid deposition, which has caused the acidification of hundreds of lakes and ponds in certain of the Plaintiff States. For example, 28 percent of streams located in the area of Moshannon State Forest in Pennsylvania are deemed acidic due, in part, to $SO_2$ emissions from coal-fired power plants. The percentage of lakes in New York's Adirondack Park that are chronically acidic (*i.e.*, corresponding to a pH of 5.28 or lower, a level at which many species of fish can no longer

survive) now approaches 20 percent. Many lakes, particularly those in the western Adirondacks, that were favored destinations of anglers just two generations ago, are now devoid of fish.

9. Particulate matter consisting of sulfates (from $SO_2$ emissions) and nitrates (from $NO_x$ emissions) falls in the Plaintiff States in the form of wet deposition (snow, sleet and rain) and dry deposition. The Plaintiff States' annual snowfall locks up large amounts of pollutants in the snow covering fields and forests. Spring runoff from snow melt creates an annual pulse of acidified water that enters lakes and streams in huge volumes, creating a phenomenon known as acid shock. Acid shock can be particularly harmful to aquatic communities because it occurs during spawning or the early life stages of many aquatic animals. Additionally, some naturally occurring levels of nutrients, such as calcium, become less available to aquatic life because they are chemically bound up buffering the effects of the incoming acids.

10. The health of northeastern high altitude forests in certain of the Plaintiff States has deteriorated and is continuing to deteriorate as a result of the weakening effect of acid deposition on trees. Acid deposition mobilizes and washes away calcium in the soil that is necessary to the survival and growth of trees. Levels of calcium in the soils of these high altitude forests have been measurably dropping over the years, with a concomitant drop in tree growth rates and decreased resistance to stress and disease. For example, stands of sugar maples in northern Pennsylvania are in decline due to low levels of soil-available calcium from acid deposition.

11. $NO_x$ emissions also cause eutrophication of coastal waters in the Plaintiff States and elsewhere, including Chesapeake Bay and the Long Island Sound, and contribute to nutrient loading in other waters, reducing the diversity of fish and other life in these essential waters.

12. Emissions of $NO_x$ and $SO_2$ from the Facilities also lead to the creation of fine nitrate and sulfate particles, which, like ozone, are transported by prevailing winds to the Plaintiff States

located downwind. Inhalation of fine particulate matter causes respiratory distress, cardiovascular disease and premature mortality. One study estimated that emissions of fine particulate matter from power plants will cause over 6,400 premature deaths in the Plaintiff States alone in 2007. Fine nitrate and sulfate particles are also toxic to aquatic life and vegetation.

13.   The Clean Air Act affords special protection to federal "Class I" areas such as certain national parks and wilderness areas. *See, e.g.,* 42 U.S.C. §§ 7473(b)(1) and 7475(d). The National Park Service has conducted vegetation damage surveys in New Jersey's Class I area, the Edwin B. Forsythe National Wildlife Refuge. These surveys have revealed ozone injury to a wide variety of species.

14.   Congress has declared visibility impairment prevention in federal Class I areas to be a national goal. *See, e.g.,* 42 U.S.C. §§ 7491 & 7492. Sulfates resulting from power plant emissions contribute to impaired visibility, harming Class I areas including, but not limited to, the Edwin B. Forsythe National Wildlife Refuge located in New Jersey.

15.   In light of the extensive environmental harm attributable to the emissions from the Facilities, the Plaintiff States seek, among other things, (a) an injunction prohibiting further operation of the Facilities until defendants implement BACT and/or LAER and obtain emission offsets, as required, and otherwise comply with the CAA, the Pennsylvania APCA, and the federal and state regulations promulgated thereunder; (b) civil penalties for defendants' past and ongoing violations of federal law; and (c) mitigation of the harm caused by the defendants' illegal emissions.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 7604(a) and 7477, and 28 U.S.C. §§ 1331, 1355 and 1367.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and § 1395(a), because defendant Allegheny Energy and several of its subsidiaries, including defendants Allegheny Service, Allegheny Supply, Monongahela, Potomac and West Penn, may be found in this District, all of the property that is the subject of this action is situated in this District, and a substantial part, if not all, of the events or omissions giving rise to the claims asserted herein arose in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS

### The Defendants

18. Allegheny Energy is a corporation organized under the laws of the State of Maryland, with a principal place of business located at 800 Cabin Hill Drive, Greensburg, Pennsylvania 15601. Formerly known as Allegheny Power Systems, Inc., Allegheny Energy is a public utility holding company that owns all outstanding common stock of its domestic electric utility subsidiaries, including Monongahela, Potomac and West Penn. Allegheny Energy also owns all outstanding common stock of its service company, Allegheny Service, and approximately 98.26 percent of the outstanding common stock of its generating company, Allegheny Supply. Allegheny Energy and its subsidiaries own and operate the Facilities that are the subject of this action.

19. Allegheny Service is a corporation organized under the laws of the State of Maryland, with a principal place of business located, upon information and belief, at 800 Cabin Hill Drive, Greensburg, Pennsylvania 15601. Allegheny Service is a wholly-owned subsidiary of

Allegheny Energy, providing, upon information and belief, management and professional

services to, among others, Allegheny Energy, Allegheny Supply, Monongahela, Potomac, and

West Penn, including accounting, administrative, information systems, environmental,

engineering, financial, legal, maintenance and other services. Upon information and belief,

Allegheny Service is an operator of the Facilities that are the subject of this action.

20. Allegheny Supply is a limited liability corporation organized under the laws of the

State of Delaware, with a principal place of business located at 4340 Northern Pike, Monroeville,

Pennsylvania 15146-2841. Allegheny Supply is a public utility holding company that is a 98.26

percent-owned subsidiary of Allegheny Energy and is engaged in the development, ownership,

operation and management of electric generating facilities. Allegheny Supply participates in the

operation of, and completely or partially owns, the Facilities.

21. Monongahela is a corporation organized under the laws of the State of Ohio, with a

principal place of business located at 1310 Fairmont Avenue, Fairmont, West Virginia 26554.

Monongahela, a wholly-owned electric utility subsidiary of Allegheny Energy doing business as

Allegheny Power, is engaged in the generation, sale, purchase, transmission and distribution of

electric power to customers in West Virginia and Ohio. Monongahela participates in the

operation of, and partially owns, the Hatfield's Ferry facility in Pennsylvania.

22. Potomac is a corporation organized under the laws of the States of Maryland and

Virginia, with a principal place of business located at 800 Cabin Hill Drive, Greensburg,

Pennsylvania 15601. Potomac, a wholly-owned electric utility subsidiary of Allegheny Energy

doing business as Allegheny Power, is engaged in the sale, purchase, transmission and

distribution of electric power to customers in Maryland, Virginia and West Virginia. Until

August 1, 2000, Potomac participated in the operation of, and partially owned, the Hatfield's

Ferry facility in Pennsylvania. At that time, Potomac transferred its ownership interest in that plant to Allegheny Supply, and subsequent to that time, Potomac has leased and participated in the operation of some of the generating capacity of Allegheny Supply's facilities.

23. West Penn is a corporation organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business located at 800 Cabin Hill Drive, Greensburg, Pennsylvania 15601. West Penn, a wholly-owned electric utility subsidiary of Allegheny Energy doing business as Allegheny Power, is engaged in the sale, purchase, transmission and distribution of electric power to customers in Pennsylvania. Until November 1999, West Penn operated and owned the Armstrong facility and the Mitchell facility. Until November 1999, West Penn participated in the operation of, and partially owned, the Hatfield's Ferry facility. At that time, West Penn transferred its ownership interest in those plants to Allegheny Supply, and subsequent to that time, West Penn has leased and participated in the operation of some of the generating capacity of Allegheny Supply's facilities.

24. Allegheny Energy, Allegheny Service, Allegheny Supply, Monongahela, Potomac and West Penn are each a "person" within the meaning of 42 U.S.C. § 7602(e).

The Integrated Allegheny Electric System

25. As Allegheny explained in its form 10-K Annual Report for 2004, "Allegheny is an integrated energy business that owns and operates electric generation facilities . . . ." Although each of the three Allegheny electric utility subsidiaries, Monongahela, Potomac and West Penn (the "Distribution Companies"), is separately incorporated, they operate under the same trade name – Allegheny Power.

26. On information and belief, the three Distribution Companies and Allegheny's electric power plants are all physically interconnected, their operations are coordinated as a single electric

utility system, and they are centrally controlled, managed and directed out of the Pennsylvania offices of Allegheny. Allegheny Supply provides power to the Distribution Companies under the terms of power supply agreements with the Distribution Companies. On information and belief, sale of electricity to the Distribution Companies currently consumes a majority of the normal operating capacity of Allegheny Supply generating assets that were previously owned by the Distribution Companies, which includes the Facilities.

27. In its regulatory filings, Allegheny refers to the workforce of its various affiliated entities collectively as "its" workforce. All of Allegheny's officers and employees are employed by Allegheny Supply, with the exception of certain individuals employed directly by Mountaineer Gas Company, an Allegheny subsidiary that is not at issue in this litigation.

28. Upon information and belief, the boards of directors of Allegheny Supply, Monongahela, Potomac and West Penn are identical, and all of the directors of those companies are employees of Allegheny Service.

29. Upon information and belief, almost all of the executive officers of Allegheny Energy are directors and/or officers of Allegheny Supply and the Distribution Companies. For example, on information and belief:

a. Paul J. Evanson is Chairman, Director, President and Chief Executive Officer of Allegheny Energy, and is also Chairman, Director and Chief Executive Officer of Allegheny Supply, Monongahela, Potomac and West Penn;

b. Jeffrey D. Serkes is a Senior Vice President and Chief Financial Officer of Allegheny Energy, and is also Vice President and Director of Allegheny Supply, Monongahela, Potomac and West Penn;

c. John P. Campbell is Vice President of Allegheny Energy, and is also President and Director of Allegheny Supply and Director of Monongahela, Potomac and West Penn;

d. Joseph H. Richardson is Vice President of Allegheny Energy, and is also President and Director of Monongahela, Potomac and West Penn and Director of Allegheny Supply; and

e. Thomas R. Gardiner is Vice President and Controller of Allegheny Energy, and is also Controller of Allegheny Supply, Monongahela, Potomac and West Penn.

30. Upon information and belief, Allegheny Energy and Allegheny Service in the past exercised and continue to exercise complete dominion and control over, and have managed and directed the environmental policy of, Allegheny Supply, Monongahela, Potomac and West Penn with respect to the operation of their power plants. Upon information and belief, employees of Allegheny Service communicate directly with state and federal regulators with respect to environmental and other issues involving Allegheny Energy, Allegheny Supply, Monongahela, Potomac and West Penn.

31. As set forth above, Allegheny is essentially one enterprise entity, consisting of several interdependent corporations wholly owned, controlled, operated and managed by a superior corporate entity – Allegheny Energy – with the goal of accomplishing one general business purpose.

32. Upon information and belief, Allegheny has been aware of the requirements of the environmental statutes and regulations more particularly described below, and was aware of the impact upon downwind locations, such as the Plaintiff States, of the emissions from the electric utility power generation plants owned and/or operated by Allegheny.

33. Upon information and belief, Allegheny Energy and Allegheny Service, through their control over and manipulation of Allegheny Supply, Monongahela, Potomac and West Penn, have made plant upgrades that increased emissions from the electric utility power generation plants owned and/or operated by these subsidiaries without complying with relevant environmental statutes and regulations, and with full awareness of the impacts such increased emissions would have, and the injuries such increased emissions would cause, upon downwind areas, including areas in the Plaintiff States.

## STATUTORY AND REGULATORY BACKGROUND

34. The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

35. Pursuant to 42 U.S.C. § 7409, the Administrator of the United States Environmental Protection Agency ("EPA") has promulgated regulations establishing primary and secondary NAAQS for certain criteria air pollutants, including $SO_2$, nitrogen dioxide ("$NO_2$") and ozone. The primary NAAQS are to be adequate to protect the public health, and the secondary NAAQS are to be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

36. Pursuant to 42 U.S.C. § 7410, each State must adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and maintenance of the NAAQS.

37. Under 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data. An area that meets the

NAAQS for a particular pollutant is termed an "attainment" area; one that does not is termed a

"nonattainment" area. Nonattainment areas for ozone may be further categorized as "severe,"

"serious," "moderate," "marginal," or "incomplete data."

Federal PSD Legal Authority

38.  Part C of subchapter 1 of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements

for the prevention of significant deterioration of air quality in those areas designated as attaining

the NAAQS.  These PSD program requirements are designed to protect public health and

welfare, to assure that economic growth will occur in a manner consistent with the preservation

of existing clean air resources, and to assure that any decision to permit increased air pollution is

made only after careful evaluation of all the consequences of such a decision and after public

participation in the decisionmaking process.

39.  Congress intended the PSD program to ensure that emissions from sources in one

state will not interfere with efforts to prevent significant deterioration of air quality in another

state.  42 U.S.C. § 7470(4).  To effectuate these goals, the PSD provisions of the Act provide that

any decision to allow increased air pollution in any area be made only after careful evaluation of

all consequences of such a decision, including the interstate effects, and after adequate

procedural  opportunities for informed public participation in the decision-making process.  42

U.S.C. § 7470(5).

40.  The PSD program is also intended "to preserve, protect and enhance the air quality in

national parks, national wilderness areas . . . and other areas of special national or regional

natural, recreational, scenic or historic value."  42 U.S.C. § 7470(2).  Certain procedures must be

followed with regard to potential impact on Class I areas from a proposed source or modification.

Under 42 U.S.C. §§ 7475(d)(2)(A)-(C), EPA must provide notice of the PSD permit application

to the federal official charged with responsibility for management of any lands within a Class I area that may be affected by emissions from the proposed facility. The notification must include an analysis of the proposed source's anticipated impacts on visibility in the Class I area.

41. The federal land manager must then make a determination whether the proposed project will adversely impact air quality related values (including visibility) of any lands within the Class I area. In any case where the federal land manager files a notice alleging that emissions from a proposed project may cause or contribute to a change in the air quality in such area and identifying the potential adverse impact of such change, a permit shall not be issued unless the owner or operator of such facility demonstrates that emissions of particulate matter and $SO_2$ will not cause or contribute to concentrations that exceed the maximum allowable increases for a Class I area.

42. 42 U.S.C. § 7475(a) prohibits the construction of a major emitting facility in an area designated as attainment unless a PSD permit has been issued. 42 U.S.C. § 7479(1) defines "major emitting facility" as including, among other things, (a) any fossil-fuel fired steam electric plant with a heat input of more than 250 million British thermal units per hour ("Btu/hr") that emits or has the potential to emit 100 tons per year ("tpy") or more of any air pollutant, and (b) any other source with the potential to emit 250 tpy or more of any air pollutant.

43. In accordance with 42 U.S.C. § 7471, each SIP shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated pursuant to these provisions, to prevent significant deterioration of air quality in attainment areas.

44. A state may comply with 42 U.S.C. § 7471 either (a) by being delegated by EPA the authority to issue permits under, and/or enforce, the federal PSD regulations set forth at 40

C.F.R. § 52.21, or (b) by promulgating its own PSD regulations that must be at least as stringent

as those set forth at 40 C.F.R. § 51.166, approved as part of its SIP by EPA.

45. EPA has duly promulgated regulations at 40 C.F.R. § 52.21 to implement the PSD

program.  As set forth at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who

wishes to construct or modify a major emitting facility in an attainment area to demonstrate,

before construction commences, that construction of the facility will not cause or contribute to air

pollution in violation of any ambient air quality standard or any specified incremental amount.

46. The provisions of 40 C.F.R. § 52.21(i) prohibit the construction or major

modification of a major stationary source in any attainment area unless a PSD permit has been

issued that meets the requirements of 40 C.F.R. §§ 52.21(j)-(r).  The term "major stationary

source" is defined at 40 C.F.R. § 52.21(b)(1)(i) to include, among other things, (a) any fossil-fuel

fired steam electric plant of more than 250 million Btu/hr that emits or has the potential to emit

100 tpy or more of any air pollutant subject to regulation under the Act, (b) any other facility that

emits, or has the potential to emit, 250 tpy or more of any air pollutant subject to regulation

under the Act, or (c) any physical change that would occur at a stationary source not otherwise

qualifying as a major stationary source, if the changes would constitute a major stationary source

by itself.

47. "Major modification" is defined at 40 C.F.R. § 52.21(b)(2) as any physical change in

or change in the method of operation of a major stationary source that would result in a

significant net emissions increase of any pollutant subject to regulation under the Act.

"Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i), in reference to a net emissions increase or

the potential of a source to emit any of the following pollutants, as a rate of emissions that would

equal or exceed any of the following: for ozone, 40 tpy of VOCs; for NO$_x$, 40 tpy; for SO$_2$, 40 tpy; for particulate matter, 25 tpy.

48. As set forth at 40 C.F.R. § 52.21(j), a new major stationary source or a major modification shall apply best available control technology ("BACT") for each air pollutant subject to a NAAQS that it would have the potential to emit in significant quantities. BACT is the maximum degree of emission reduction achievable for each air pollutant subject to a NAAQS, taking into consideration energy, environmental and economic impacts of the emission reductions. 40 C.F.R. § 52.21(b)(12).

49. Pursuant to 40 C.F.R. § 52.21(k), the owner or operator of the facility to be modified must demonstrate that the modified source would not contribute to violation of (a) any of the NAAQS in any air quality control region (including regions located downwind of the source); or (b) any maximum allowable increase in ambient pollutant concentration in effect in any area.

50. Pursuant to 40 C.F.R. § 52.21(p), notification of any permit application for a proposed major source or modification, the emissions from which may affect a Class I area, must be provided to the federal land manager for that area. The notification must include an analysis of the proposed source's anticipated impacts on visibility in the Class I area. A permit may not be issued if certain impacts, including impacts on allowable increments and air quality related values (including visibility) for the Class I area, would occur.

Pennsylvania PSD Legal Authority

51. In June 1983, Pennsylvania added a provision to its administrative code, 25 Pa. Code § 127.83 (25 Pa. Code, Chapter 127, Subchapter D, relating to prevention of significant deterioration of air quality), to adopt and incorporate by reference the federal PSD regulations promulgated at 40 C.F.R. part 52. 13 Pa. Bull. 1940 (Jun. 18, 1983). EPA approved this

adoption and incorporation by reference, effective October 22, 1984.  49 Fed. Reg. 33127 (Aug. 21, 1984).

52.  Accordingly, PSD definitions and requirements under Pennsylvania law are identical to the federal PSD regulatory requirements outlined in paragraphs 38-50 above, and any violation of the federal PSD regulations by a Pennsylvania air emissions facility is also a violation of Pennsylvania law.

Pennsylvania Nonattainment NSR Legal Authority

53.  As of January 15, 1994, as a replacement for its preexisting nonattainment NSR permit regulations, the Commonwealth of Pennsylvania promulgated new nonattainment NSR preconstruction permit regulations at 25 Pa. Code §§ 127.201-.216 (25 Pa. Code, Chapter 127, Subchapter E, relating to new source review).  24 Pa. Bull. 443 (Jan. 15, 1994).

54.  The permit requirements set out in these regulations apply in areas designated as nonattainment with the NAAQS.  Pursuant to these regulations, nonattainment NSR permits are required for new or modified facilities meeting certain criteria, and are issued only if certain preconstruction requirements are met.

55.  Under these regulations, the term "major facility" is defined to mean a facility that has the potential to emit a pollutant in an amount equal to or greater than an applicable annual emissions rate set forth in 25 Pa. Code § 127.203.  25 Pa. Code § 121.1 (definition of "major facility").  The term "major $NO_x$ emitting facility" is defined to mean, among other things, a facility which emits or has the potential to emit $NO_x$ greater than 100 tons per year in an area included in an ozone transport region established under CAA section 184, 42 U.S.C. § 7511c.  25 Pa. Code § 121.1 (definition of "major $NO_x$ emitting facility").

56. The term "major modification" is defined to mean a physical change or change in the method of operation of a major facility that results in a increase in emissions equal to or exceeding emission rate thresholds or significance levels specified in 25 Pa. Code 127.203. 25 Pa. Code § 121.1 (definition of "major modification").

57. The term "new source" is defined to mean a stationary air contamination source that (a) was constructed and commenced operation on or after July 1, 1972 and (b) was modified so that the fixed capital cost of new components exceeded 50 percent of the fixed capital costs that would be required to construct a comparable entirely new source. 25 Pa. Code § 121.1 (definition of "new source").

58. Under the regulations, an existing $NO_x$ facility that is located in an area that is classified as moderate nonattainment for ozone must meet preconstruction requirements before installing a new source that results in an increase in the facility's potential to emit $NO_x$ equal to or exceeding 40 tpy, 1,000 pounds per day, or 100 pounds per hour, whichever is more restrictive. 25 Pa. Code §§ 127.201, 127.211(a)(2) & 127.203(b)(1). Such emissions increases are calculated pursuant to the methods set out at 25 Pa. Code § 127.211(b) and §§ 127.207(1) and (3)-(7).

59. Similarly, under these regulations, an existing facility with the potential to emit 100 tons per year of $SO_x$ that is located in a nonattainment area for $SO_2$ must meet preconstruction requirements before undertaking a modification, including the addition of a new source, that results in an increase in the facility's potential to emit $SO_x$ equal to or exceeding 40 tons per year, 1,000 pounds per day, or 100 pounds per hour, whichever is more restrictive. 25 Pa. Code §§ 127.201, 127.211(a)(1) & 127.203(a)(2). Such emissions increases are calculated pursuant to the methods set out at 25 Pa. Code § 127.211(b) and §§ 127.207(1) and (3)-(7).

60. The preconstruction requirements that facilities meeting the criteria set out in paragraphs 56 and 57 above must satisfy include, among other things, the following: (a) the proposed modified facility must comply with Pennsylvania's lowest achievable emissions rate ("LAER") standard for emissions control; (b) the owner or operator of the proposed modified facility must demonstrate that all of the other air emissions facilities in Pennsylvania that it owns or operates are in compliance, or on a schedule for compliance, with applicable emissions limitations and standards; and (c) the proposed modified facility must obtain emissions offsets equal to the net increase in potential to emit from the proposed modification. 25 Pa. Code § 127.205; *see also* 25 Pa. Code § 121.1 (definition of "LAER").

Enforcement Provisions

61. Pursuant to 42 U.S.C. § 7604(a)(3), any person may commence, in the United States district courts, a suit against any person who constructs a modified major emitting facility without a PSD permit. No notice must be provided before the commencement of a suit under 42 U.S.C. § 7604(a)(3).

62. 42 U.S.C. § 7602(e) defines a "person" to include corporations and States. The Commonwealth of Pennsylvania and the States of Connecticut, Maryland, New Jersey and New York are each a "person" within the meaning of 42 U.S.C. § 7602(e).

63. 42 U.S.C. § 7413(b) authorizes the award of both injunctive relief and civil penalties of up to $32,500 per day for each violation.

64. The Commonwealth of Pennsylvania Department of Environmental Protection is the executive agency of the Commonwealth charged with the responsibility of administering and enforcing the provisions of: the Pennsylvania APCA, Act of January 8, 1960, P.L. 2119 (1959), *as amended*, 35 P.S. § 4001 *et seq.*; Section 1917-A of the Administrative Code of 1929, Act of

-19-

April 9, 1929, P.L. 177, *as amended*, 71 Pa .Stat. §§ 510-517 ("Administrative Code") and the provisions of the rules and regulations promulgated at Title 25 of the Pennsylvania Code, including the PSD and nonattainment NSR provisions of 25 Pa. Code §§ 121.1, 127.81-.83 and 127.201-.216.  Moreover, the Department has the duty and power to institute, in a court of competent jurisdiction, proceedings to compel compliance with the Pennsylvania APCA.

65.  35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation.

NOTICES

66.  Notwithstanding the fact that notice is not a prerequisite for suits brought under 42 U.S.C. § 7604(a)(3), the Plaintiff States have provided notice of many of their claims to the owners of the Facilities.

67.  On or about May 20, 2004, on behalf of the States of New York, Connecticut and New Jersey and the Commonwealth of Pennsylvania, the Attorneys General of New York, Connecticut and New Jersey and the Chief Counsel of the Pennsylvania Department of Environmental Protection, sent a notice of intent to sue to defendants Allegheny Energy, Allegheny Supply, Monongahela and West Penn for violations under the CAA.

68.  On or about September 8, 2004, on behalf of the State of Maryland, the Attorney General of Maryland sent a notice of intent to sue to defendants Allegheny Energy, Allegheny Supply, Monongahela and West Penn for violations under the CAA.

69.  Each notice was served by certified mail on the EPA Administrator, the EPA Regional Administrator for the EPA Region in which the plants identified in the notice are located, the Governor of Pennsylvania, Allegheny Energy, Allegheny Supply, Monongahela and West Penn.  Each notice provided sufficient information to permit the recipients to identify the

activity alleged to be in violation, the persons or persons responsible for the alleged violation (*i.e.*, Allegheny Energy and its subsidiaries), the location of the alleged violations, the date of the violations and the full name and address of each person giving the notice.

70.  More than sixty days have elapsed since the notices were sent by the Plaintiff States.

FIRST CLAIM FOR RELIEF

*Armstrong Unit 1 –*<br>*PSD claim under federal law with respect to NOx,*<br>*brought by all Plaintiff States*

71.  On information and belief, the Armstrong facility includes two electricity generating units, each consisting of one boiler and one steam turbine. Unit 1 was placed in service in 1958. On information and belief, at all times relevant to this complaint, Allegheny reported to the Federal Energy Regulatory Commission ("FERC") that Armstrong Unit 1 had a Maximum Generator Nameplate Rating of 163 MW. Unit 2 was placed in service in 1959. On information and belief, at all times relevant to this complaint, Allegheny reported to FERC that Armstrong Unit 2 had a Maximum Generator Nameplate Rating of 163 MW.

72.  In 2003, the Armstrong facility emitted 3,976 tons of $NO_x$.

73.  At the time Allegheny constructed the Armstrong facility, and at the time that the federal PSD regulations became effective on August 7, 1980, the facility had the potential to emit in excess of 250 tons per year of $NO_x$.

74.  The Armstrong facility is, and was at the time Allegheny made the modifications identified in this complaint, a "major emitting facility" within the meaning of 42 U.S.C. § 7479(1), a "major stationary source" within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(b) and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and a "major $NO_x$

-21-

emitting facility" within the meaning of 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

75. The Armstrong facility is located in an area that was classified as moderate nonattainment for ozone under the 1-hour standard from 1978 through October 18, 2001, has been attainment for ozone under the 1-hour standard since then, and has been nonattainment for ozone under the 8-hour standard from June 15, 2004 to present. The Armstrong facility is located in an area that has been attainment for $NO_2$ from 1978 to present.

76. Allegheny modified Unit 1 of the Armstrong facility when it, *inter alia*, replaced the entire Unit 1 boiler, with the exception of the steam drum, downcomer feeder tubes and six downcomers, in 1995. The work performed included the replacement of the structural steel, the casing of the boiler and the air draft supply system and its foundations.

77. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $NO_x$.

78. The aforesaid modifications constitute major modifications, within the meaning of 40 C.F.R. § 52.21(b)(2), 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), for $NO_x$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

79. Allegheny has not applied for or obtained a PSD permit for the modifications of the Armstrong facility identified in this claim for relief.

80. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 42 U.S.C.

-22-

§ 7475, 40 C.F.R. §§ 52.21(j) through (r), or 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), including consideration of impacts on Federal Class I areas.

81. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ emissions from Unit 1 of the Armstrong facility.

82. Therefore, since 1995 or earlier, Allegheny has been in violation of 42 U.S.C. §§ 7475(a) and (d), 40 C.F.R. § 52.21, the Pennsylvania SIP (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

83. Unless restrained by an order of this Court, these violations of the Act will continue.

84. As provided in 42 U.S.C. §§ 7413(b) and 7604(a), the violations set forth above subject Allegheny to injunctive relief and civil penalties of up to $25,000 per day for each violation of the Act prior to January 30, 1997, and $27,500 per day for each such violation between January 30, 1997 and March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 31 U.S.C. § 3701.

## SECOND CLAIM FOR RELIEF

*Armstrong Unit 1 –*
*PSD claim under Pennsylvania law with respect to $NO_x$,*
*brought by Pennsylvania*

85. Paragraphs 71 through 75, regarding the Armstrong facility, are realleged and incorporated by reference in this claim for relief.

86. Allegheny modified Unit 1 of the Armstrong facility when it, *inter alia*, replaced the entire Unit 1 boiler, with the exception of the steam drum, downcomer feeder tubes and six

downcomers, in 1995. The work performed included the replacement of the structural steel, the casing of the boiler and the air draft supply system and its foundations.

87. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $NO_x$.

88. The aforesaid modifications constitute major modifications, within the meaning of 25 Pa. Code § 127.83 and 25 Pa. Code § 121.1, for $NO_x$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

89. Allegheny has not applied for or obtained a PSD permit for the modifications of the Armstrong facility identified in this claim for relief.

90. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 25 Pa. Code § 127.83, including consideration of impacts on Federal Class I areas.

91. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ emissions from Unit 1 of the Armstrong facility.

92. Therefore, since 1995 or earlier, Allegheny has been in violation of 25 Pa. Code § 127.83.

93. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

94. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

## THIRD CLAIM FOR RELIEF

*Armstrong Unit 1 –*
*Nonattainment NSR claim under Pennsylvania law with respect to SO₂ and ozone,*
*brought by Pennsylvania*

95. Paragraphs 71 through 75, regarding the Armstrong facility, are realleged and incorporated by reference in this claim for relief.

96. The Armstrong facility is in an area that has been nonattainment for $SO_2$ from 1978 to the present. At the time Allegheny constructed the Armstrong facility, and at the time that the federal PSD regulations became effective on August 7, 1980, the facility had the potential to emit in excess of 250 tons per year of $SO_2$. The Armstrong facility is, and was at the time Allegheny made the modifications identified in this claim for relief, a "major facility" for $SO_2$ within the meaning of 25 Pa. Code § 121.1, and a "major NOx emitting facility" within the meaning of 25 PA. Code § 121.1. In 2003, the Armstrong facility emitted 34,141 tons of SO2.

97. Allegheny modified Unit 1 of the Armstrong facility when it, *inter alia*, replaced the entire Unit 1 boiler, with the exception of the steam drum, downcomer feeder tubes and six downcomers, in 1995. The work performed included the replacement of the structural steel, the casing of the boiler and the air draft supply system and its foundations.

98. On information and belief, the fixed capital cost of the new components installed during the aforesaid modifications exceeded 50 percent of the fixed capital cost that would be required to construct a comparable entirely new boiler, so that the aforesaid modifications constitute the installation of a "new source" within the meaning of 25 Pa. Code § 121.1.

99. Had Allegheny complied with the nonattainment NSR preconstruction permitting requirements, it would have projected that the modifications identified in the preceding

paragraph would result in an increase in potential to emit of more than 40 tons per year of $SO_2$ and/or $NO_x$, as calculated pursuant to 25 Pa. Code § 127.211(b) and §§ 127.207(1) and (3)-(7).

100.   The aforesaid modifications are major modifications, within the meaning of 25 Pa. Code §§ 121.1 and 127.203(a) and (b), for $SO_2$ and/or ozone, and are otherwise subject to the nonattainment NSR permitting requirements of 25 Pa. Code §§ 127.201-.216. Therefore, a nonattainment NSR permit should have been obtained prior to the commencement of construction.

101.   Allegheny has not applied for or obtained nonattainment NSR permits for the modifications of the Armstrong facility identified in this claim for relief.

102.   Prior to constructing the aforesaid modifications, Allegheny did not obtain emission offsets or comply with any other substantive requirements of 25 Pa. Code §§ 127.201-.216.

103.   Allegheny has not implemented, or operated in accordance with, LAER for control of $SO_2$ or $NO_x$ emissions from Unit 1 of the Armstrong facility.

104.   Therefore, since 1995 or earlier, Allegheny has been in violation of 25 Pa. Code §§ 127.201-.216.

105.   Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

106.   35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

## FOURTH CLAIM FOR RELIEF

*Armstrong Unit 2 –*
*PSD claim under federal law with respect to $NO_x$*
*brought by all Plaintiff States*

107. Paragraphs 71 through 75, regarding the Armstrong facility, are realleged and incorporated by reference in this claim for relief.

108. Allegheny modified Unit 2 of the Armstrong facility when it, *inter alia*, replaced the entire Unit 2 boiler, with the exception of the steam drum, downcomer feeder tubes and six downcomers, in 1994. The work performed included the replacement of the structural steel, the casing of the boiler and the air draft supply system and its foundations.

109. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $NO_x$.

110. The aforesaid modifications constitute major modifications, within the meaning of 40 C.F.R. § 52.21(b)(2), 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), for $NO_x$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

111. Allegheny has not applied for or obtained a PSD permit for the modifications of the Armstrong facility identified in this claim for relief.

112. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(j) through (r), or 25 Pa. Code § 127.83 (as

made federal law by 40 C.F.R. §§ 52.2020-.2062), including consideration of impacts on Federal Class I areas.

113. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ emissions from Unit 2 of the Armstrong facility.

114. Therefore, since 1994 or earlier, Allegheny has been in violation of 42 U.S.C. §§ 7475(a) and (d), 40 C.F.R. § 52.21, the Pennsylvania SIP (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

115. Unless restrained by an order of this Court, these violations of the Act will continue.

116. As provided in 42 U.S.C. §§ 7413(b) and 7604(a), the violations set forth above subject Allegheny to injunctive relief and civil penalties of up to $25,000 per day for each violation of the Act prior to January 30, 1997, and $27,500 per day for each such violation between January 30, 1997 and March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 31 U.S.C. § 3701.

<u>FIFTH CLAIM FOR RELIEF</u>

*Armstrong Unit 2 –*
*PSD claim under Pennsylvania law with respect to $NO_x$,*
*brought by Pennsylvania*

117. Paragraphs 71 through 75, regarding the Armstrong facility, are realleged and incorporated by reference in this claim for relief.

118. Allegheny modified Unit 2 of the Armstrong facility when it, *inter alia*, replaced the entire Unit 2 boiler, with the exception of the steam drum, downcomer feeder tubes and six

downcomers, in 1994. The work performed included the replacement of the structural steel, the casing of the boiler and the air draft supply system and its foundations.

119. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $NO_x$.

120. The aforesaid modifications constitute major modifications, within the meaning of 25 Pa. Code § 127.83 and 25 Pa. Code § 121.1, for $NO_x$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

121. Allegheny has not applied for or obtained a PSD permit for the modifications of the Armstrong facility identified in this claim for relief.

122. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 25 Pa. Code § 127.83, including consideration of impacts on Federal Class I areas.

123. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ emissions from Unit 2 of the Armstrong facility.

124. Therefore, since 1994 or earlier, Allegheny has been in violation of 25 Pa. Code § 127.83.

125. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

126. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

### SIXTH CLAIM FOR RELIEF

*Armstrong Unit 2 –*
*Nonattainment NSR claim under Pennsylvania law with regard to SO₂ and ozone,*
*brought by Pennsylvania*

127. Paragraphs 71 through 75, and Paragraph 96, regarding the Armstrong facility, are realleged and incorporated by reference in this claim for relief.

128. Allegheny modified Unit 2 of the Armstrong facility when it, *inter alia*, replaced the entire Unit 2 boiler, with the exception of the steam drum, downcomer feeder tubes and six downcomers, in 1994. The work performed included the replacement of the structural steel, the casing of the boiler and the air draft supply system and its foundations.

129. On information and belief, the fixed capital cost of the new components installed during the aforesaid modifications exceeded 50 percent of the fixed capital cost that would be required to construct a comparable entirely new boiler, so that the aforesaid modifications constitute the installation of a "new source" within the meaning of 25 Pa. Code § 121.1.

130. Had Allegheny complied with the nonattainment NSR preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in an increase in potential to emit of more than 40 tons per year of $SO_2$ and/or $NO_x$, as calculated pursuant to 25 Pa. Code § 127.211(b) and §§ 127.207(1) and (3)-(7).

131. The aforesaid modifications are major modifications, within the meaning of 25 Pa. Code §§ 121.1 and 127.203(a) and (b), for $SO_2$ and/or ozone, and are otherwise subject to the nonattainment NSR permitting requirements of 25 Pa. Code §§ 127.201-.216. Therefore, a

nonattainment NSR permit should have been obtained prior to the commencement of construction.

132. Allegheny has not applied for or obtained nonattainment NSR permits for the modifications of the Armstrong facility identified in this claim for relief.

133. Prior to constructing the aforesaid modifications, Allegheny did not obtain emission offsets or comply with any other substantive requirements of 25 Pa. Code §§ 127.201-.216.

134. Allegheny has not implemented, or operated in accordance with, LAER for control of $SO_2$ or $NO_x$ emissions from Unit 2 of the Armstrong facility.

135. Therefore, since 1994 or earlier, Allegheny has been in violation of 25 Pa. Code §§ 127.201-.216.

136. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

137. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

SEVENTH CLAIM FOR RELIEF

*Hatfield's Ferry Unit 1 –*
*PSD claim under federal law with regard to $SO_2$ and $NO_x$,*
*brought by all Plaintiff States*

138. On information and belief, the Hatfield's Ferry facility includes three electricity generating units, each consisting of one boiler and one steam turbine. Unit 1 was placed in service in 1969. On information and belief, at all times relevant to this complaint, Allegheny reported to FERC that Hatfield's Ferry Unit 1 had a Maximum Generator Nameplate Rating of 576 MW. Unit 2 was placed in service in 1970. On information and belief, at all times relevant

to this complaint, Allegheny reported to FERC that Hatfield's Ferry Unit 2 had a Maximum Generator Nameplate Rating of 576 MW. Unit 3 was placed in service in 1971. On information and belief, at all times relevant to this complaint, Allegheny reported to FERC that Hatfield's Ferry Unit 3 had a Maximum Generator Nameplate Rating of 576 MW.

139. In 2003, the Hatfield's Ferry facility emitted 17,643 tons of $NO_x$ and 139,424 tons of $SO_2$.

140. At the time Allegheny constructed the Hatfield's Ferry facility, and at the time that the PSD regulations became effective on August 7, 1980, the facility had the potential to emit in excess of 250 tons per year of $NO_x$ and 250 tons per year of $SO_2$.

141. The Hatfield's Ferry facility is, and was at the time Allegheny made the modifications identified in this complaint, a "major emitting facility" within the meaning of 42 U.S.C. § 7479(1), a "major stationary source" within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(b) and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), a "major facility" for $SO_2$ within the meaning of 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and a "major $NO_x$ emitting facility" within the meaning of 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

142. The Hatfield's Ferry facility is located in an area that has been attainment for $SO_2$ and $NO_2$ from 1978 to the present. The Hatfield's Ferry facility is located in an area that was classified as (a) nonattainment/incomplete data for ozone under the 1-hour standard from 1978 through June 4, 1998; (b) an area for which the 1-hour standard for ozone was not applicable from June 5, 1998 through January 15, 2001; (c) nonattainment/incomplete data for ozone under the 1-hour standard from January 16, 2001 to present; and (d) nonattainment for ozone under the 8-hour standard from June 15, 2004 to present.

143. Allegheny modified Unit 1 of the Hatfield's Ferry facility when it, *inter alia*, replaced the secondary superheater outlet header and all of the lower slope panels in 1997.

144. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $SO_2$ and $NO_x$.

145. The aforesaid modifications constitute major modifications, within the meaning of 40 C.F.R. § 52.21(b)(2), 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), for $NO_x$ and $SO_2$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

146. Allegheny has not applied for or obtained a PSD permit for the modifications of the Hatfield's Ferry facility identified in this claim for relief.

147. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(j) through (r), or 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), including consideration of impacts on Federal Class I areas.

148. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 1 of the Hatfield's Ferry facility.

149. Therefore, since 1997 or earlier, Allegheny has been in violation of 42 U.S.C. §§ 7475(a) and (d), 40 C.F.R. § 52.21, the Pennsylvania SIP (as made federal law by 40 C.F.R.

§§ 52.2020-.2062), and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

150. Unless restrained by an order of this Court, these violations of the Act will continue.

151. As provided in 42 U.S.C. §§ 7413(b) and 7604(a), the violations set forth above subject Allegheny to injunctive relief and civil penalties of up to $25,000 per day for each violation of the Act prior to January 30, 1997, and $27,500 per day for each such violation between January 30, 1997 and March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 31 U.S.C. § 3701.

## EIGHTH CLAIM FOR RELIEF

*Hatfield's Ferry Unit 1 –*
*PSD claim under Pennsylvania law with regard to SO₂ and NOₓ*
*brought by Pennsylvania*

152. Paragraphs 138 through 142, regarding the Hatfield's Ferry facility, are realleged and incorporated by reference in this claim for relief.

153. Allegheny modified Unit 1 of the Hatfield's Ferry facility when it, *inter alia*, replaced the secondary superheater outlet header and all of the lower slope panels in 1997.

154. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $SO_2$ and/or $NO_x$.

155. The aforesaid modifications constitute major modifications, within the meaning of 25 Pa. Code § 127.83 and 25 Pa. Code § 121.1, for $NO_x$ and/or $SO_2$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

156. Allegheny has not applied for or obtained a PSD permit for the modifications of the Hatfield's Ferry facility identified in this claim for relief.

157. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 25 Pa. Code § 127.83, including consideration of impacts on Federal Class I areas.

158. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 1 of the Hatfield's Ferry facility.

159. Therefore, since 1996 or earlier, Allegheny has been in violation of 25 Pa. Code § 127.83.

160. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

161. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

NINTH CLAIM FOR RELIEF

*Hatfield's Ferry Unit 2 –*
*PSD claim under federal law with regard to $SO_2$ and $NO_x$,*
*brought by all Plaintiff States*

162. Paragraphs 138 through 142, regarding the Hatfield's Ferry facility, are realleged and incorporated by reference in this claim for relief.

163. Allegheny modified Unit 2 of the Hatfield's Ferry facility when it, *inter alia*, replaced the pendant reheater bank and connecting crossover tubes in 1993 and replaced the secondary superheater outlet header and all of the lower slope panels in 1999.

164. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that one or more of the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $SO_2$ and $NO_x$.

165. One or more of the aforesaid modifications constitute major modifications, within the meaning of 40 C.F.R. § 52.21(b)(2), 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), for $NO_x$ and $SO_2$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

166. Allegheny has not applied for or obtained a PSD permit for the modifications of the Hatfield's Ferry facility identified in this claim for relief.

167. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(j) through (r), or 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), including consideration of impacts on Federal Class I areas.

168. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 2 of the Hatfield Ferry facility.

169. Therefore, since 1993 or earlier, Allegheny has been in violation of 42 U.S.C. §§ 7475(a) and (d), 40 C.F.R. § 52.21, the Pennsylvania SIP (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

170. Unless restrained by an order of this Court, these violations of the Act will continue.

171.  As provided in 42 U.S.C. §§ 7413(b) and 7604(a), the violations set forth above subject Allegheny to injunctive relief and civil penalties of up to $25,000 per day for each violation of the Act prior to January 30, 1997, and $27,500 per day for each such violation between January 30, 1997 and March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 31 U.S.C. § 3701.

<u>TENTH CLAIM FOR RELIEF</u>

*Hatfield's Ferry Unit 2 –*
*PSD claim under Pennsylvania law with regard to $SO_2$ and $NO_x$,*
*brought by Pennsylvania*

172.  Paragraphs 138 through 142, regarding the Hatfield's Ferry facility, are realleged and incorporated by reference in this claim for relief.

173.  Allegheny modified Unit 2 of the Hatfield's Ferry facility when it, *inter alia*, replaced the pendant reheater bank and connecting crossover tubes in 1993 and replaced the secondary superheater outlet header and all of the lower slope panels in 1999.

174.  Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that one or more of the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $SO_2$ and/or $NO_x$.

175.  One or more of the aforesaid modifications constitute major modifications, within the meaning of 25 Pa. Code § 127.83 and 25 Pa. Code § 121.1, for $NO_x$ and/or $SO_2$.  Therefore, a PSD permit should have been obtained prior to the commencement of construction.

176.  Allegheny has not applied for or obtained a PSD permit for the modifications of the Hatfield's Ferry facility identified in this claim for relief.

177. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 25 Pa. Code § 127.83, including consideration of impacts on Federal Class I areas.

178. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 2 of the Hatfield's Ferry facility.

179. Therefore, since 1993 or earlier, Allegheny has been in violation of 25 Pa. Code § 127.83.

180. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

181. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

## ELEVENTH CLAIM FOR RELIEF

### Hatfield's Ferry Unit 3 –
### PSD claim under federal law with regard to $SO_2$ and $NO_x$,
### brought by all Plaintiff States

182. Paragraphs 138 through 142, regarding the Hatfield's Ferry facility, are realleged and incorporated by reference in this claim for relief.

183. Allegheny modified Unit 3 of the Hatfield's Ferry facility when it, *inter alia*, replaced the secondary superheater outlet header and all of the lower slope panels and ash hopper tube panels in 1996.

184. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $SO_2$ and $NO_x$.

185. The aforesaid modifications constitute major modifications, within the meaning of 40 C.F.R. § 52.21(b)(2), 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), for $NO_x$ and $SO_2$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

186. Allegheny has not applied for or obtained a PSD permit for the modifications of the Hatfield's Ferry facility identified in this claim for relief.

187. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(j) through (r), or 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), including consideration of impacts on Federal Class I areas.

188. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 3 of the Hatfield's Ferry facility.

189. Therefore, since 1996 or earlier, Allegheny has been in violation of 42 U.S.C. §§ 7475(a) and (d), 40 C.F.R. § 52.21, the Pennsylvania SIP (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

190. Unless restrained by an order of this Court, these violations of the Act will continue.

191. As provided in 42 U.S.C. §§ 7413(b) and 7604(a), the violations set forth above subject Allegheny to injunctive relief and civil penalties of up to $25,000 per day for each violation of the Act prior to January 30, 1997, and $27,500 per day for each such violation between January 30, 1997 and March 15, 2004, and $32,500 per day for each violation occurring after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 31 U.S.C. § 3701.

<u>TWELFTH CLAIM FOR RELIEF</u>

*Hatfield's Ferry Unit 3 –*
*PSD claim under Pennsylvania law with regard to $SO_2$ and $NO_x$,*
*brought by Pennsylvania*

192. Paragraphs 138 through 142, regarding the Hatfield's Ferry facility, are realleged and incorporated by reference in this claim for relief.

193. Allegheny modified Unit 3 of the Hatfield's Ferry facility when it, *inter alia,* replaced the secondary superheater outlet header and all of the lower slope panels and ash hopper tube panels in 1996.

194. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $SO_2$ and/or $NO_x$.

195. The aforesaid modifications constitute major modifications, within the meaning of 25 Pa. Code § 127.83 and 25 Pa. Code § 121.1, for $NO_x$ and/or $SO_2$. Therefore, a PSD permit should have been obtained prior to the commencement of construction.

196. Allegheny has not applied for or obtained a PSD permit for the modifications of the Hatfield's Ferry facility identified in this claim for relief.

197. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate that the emission increases resulting from the modifications would not contribute to nonattainment in any air quality control regions, or comply with any other substantive requirements of 25 Pa. Code § 127.83, including consideration of impacts on Federal Class I areas.

198. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 3 of the Hatfield's Ferry facility.

199. Therefore, since 1996 or earlier, Allegheny has been in violation of 25 Pa. Code § 127.83.

200. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

201. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

## THIRTEENTH CLAIM FOR RELIEF

*Mitchell Unit 3 –*
*PSD claim under federal law with regard to $SO_2$ and $NO_x$.*
*brought by all Plaintiff States*

202. The Mitchell facility includes three electricity generating units. Two of those units are oil-fired; the third unit, referred to as Unit 3, is coal-fired and, on information and belief, consists of one boiler and one steam turbine. Unit 3 was placed in service in 1963. On information and belief, at all times relevant to this complaint, Allegheny reported to FERC that Mitchell Unit 3 had a Maximum Generator Nameplate Rating of 299 MW.

203. In 2003, Mitchell Unit 3 emitted 2,279 tons of $NO_x$ and 1,483 tons of $SO_2$.

204. At the time Allegheny constructed Mitchell Unit 3, and at the time that the PSD regulations became effective on August 7, 1980, the facility had the potential to emit in excess of 250 tons per year of $NO_x$ and 250 tons per year of $SO_2$.

205. The Mitchell facility is, and was at the time Allegheny made the modifications identified in this complaint, a "major emitting facility" within the meaning of 42 U.S.C. § 7479(1), a "major stationary source" within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(b) and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), a "major facility" for $SO_2$ within the meaning of 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), and a "major $NO_x$ emitting facility" within the meaning of 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062).

206. The Mitchell facility is located in an area that has been unclassifiable for $SO_2$ from 1981 to the present. The Mitchell facility is located in an area that (a) was classified as moderate nonattainment for ozone under the 1-hour standard from 1978 through October 18, 2001, (b) has been attainment for ozone under the 1-hour standard since then, and (c) has been nonattainment for ozone under the 8-hour standard from June 15, 2004 to present. The Mitchell facility is located in an area that has been attainment for $NO_2$ from 1978 to present.

207. Allegheny modified Unit 3 of the Mitchell facility when it, *inter alia*, replaced 24 front and rear ash hopper partial lower slope tube panels in 1994.

208. Had Allegheny complied with the PSD preconstruction permitting requirements, it would have projected that the modifications identified in the preceding paragraph would result in a net increase of more than 40 tons per year in emissions of $NO_x$ and $SO_2$.

209. The aforesaid modifications constitute major modifications, within the meaning of 40 C.F.R. § 52.21(b)(2), 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-

.2062), and 25 Pa. Code § 121.1 (as made federal law by 40 C.F.R. §§ 52.2020-.2062), for $NO_x$

and $SO_2$. Therefore, a PSD permit should have been obtained prior to the commencement of

construction.

210. Allegheny has not applied for or obtained a PSD permit for the modifications of the

Mitchell facility identified in this claim for relief.

211. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate

that the emission increases resulting from the modifications would not contribute to

nonattainment in any air quality control regions, or comply with any other substantive

requirements of 42 U.S.C. § 7475, 40 C.F.R. §§ 52.21(j) through (r), or 25 Pa. Code § 127.83 (as

made federal law by 40 C.F.R. §§ 52.2020-.2062), including consideration of impacts on Federal

Class I areas.

212. Allegheny has not implemented, or operated in accordance with, BACT for control

of $NO_x$ or $SO_2$ emissions from Unit 3 of the Mitchell facility.

213. Therefore, since 1994 or earlier, Allegheny has been in violation of 42 U.S.C.

§§ 7475(a) and (d), 40 C.F.R. § 52.21, the Pennsylvania SIP (as made federal law by 40 C.F.R.

§§ 52.2020-.2062), and 25 Pa. Code § 127.83 (as made federal law by 40 C.F.R. §§ 52.2020-

.2062).

214. Unless restrained by an order of this Court, these violations of the Act will continue.

215. As provided in 42 U.S.C. §§ 7413(b) and 7604(a), the violations set forth above

subject Allegheny to injunctive relief and civil penalties of up to $25,000 per day for each

violation of the Act prior to January 30, 1997, and $27,500 per day for each such violation

between January 30, 1997 and March 15, 2004, and $32,500 per day for each violation occurring

after March 15, 2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990,

28 U.S.C. § 2461 and 31 U.S.C. § 3701.

## FOURTEENTH CLAIM FOR RELIEF

*Mitchell Unit 3 –*
*PSD claim under Pennsylvania law with regard to $SO_2$ and $NO_x$,*
*brought by Pennsylvania*

216. Paragraphs 202 through 206, regarding the Mitchell facility, are realleged and

incorporated by reference in this claim for relief.

217. Allegheny modified Unit 3 of the Mitchell facility when it, *inter alia*, replaced 24

front and rear ash hopper partial lower slope tube panels in 1994.

218. Had Allegheny complied with the PSD preconstruction permitting requirements, it

would have projected that the modifications identified in the preceding paragraph would result in

a net increase of more than 40 tons per year in emissions of $SO_2$ and/or $NO_x$.

219. The aforesaid modifications constitute major modifications, within the meaning of

25 Pa. Code § 127.83 and 25 Pa. Code § 121.1, for $NO_x$ and/or $SO_2$.  Therefore, a PSD permit

should have been obtained prior to the commencement of construction.

220. Allegheny has not applied for or obtained a PSD permit for the modifications of the

Mitchell facility identified in this claim for relief.

221. Prior to constructing the aforesaid modifications, Allegheny did not demonstrate

that the emission increases resulting from the modifications would not contribute to

nonattainment in any air quality control regions, or comply with any other substantive

requirements of 25 Pa. Code § 127.83, including consideration of impacts on Federal Class I

areas.

222. Allegheny has not implemented, or operated in accordance with, BACT for control of $NO_x$ or $SO_2$ emissions from Unit 3 of the Mitchell facility.

223. Therefore, since 1994 or earlier, Allegheny has been in violation of 25 Pa. Code § 127.83.

224. Unless restrained by an order of this Court, these violations of the Pennsylvania APCA and the Pennsylvania Administrative Code will continue.

225. 35 P.S. § 4013.6(a) and 71 P.S. §§ 510-517 authorize the award of injunctive relief for each violation of the Pennsylvania APCA and the Pennsylvania Administrative Code set forth above.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States request that this Honorable Court:

1. Permanently enjoin defendants from, among other things, operating Armstrong Units 1 and 2, Hatfield's Ferry Units 1, 2 and 3, and Mitchell Unit 3 except in accordance with the CAA, the federal PSD regulations, and the Pennsylvania SIP regulations, including the Pennsylvania PSD and nonattainment NSR regulations;

2. Order defendants to remedy their past violations;

3. Order defendants to take other appropriate actions to remedy, mitigate, or offset the harm to public health and the environment caused by the violations of federal and state law alleged above;

4. Assess a civil penalty against defendants for each violation of federal law under the Act, the federal PSD regulations, and the state SIP regulations, including the state PSD and nonattainment NSR regulations as made federal law, as follows:  $25,000 per day for each such violation prior to January 30, 1997;  $27,500 per day for each such violation between January 30,

1997 and March 15, 2004; and $32,500 per day for each violation occurring after March 15,

2004, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461

and 31 U.S.C. § 3701.

     5. Award the Plaintiff States their costs of this action and attorneys' fees; and

     6. Grant such other relief as the Court deems just and proper.

Dated:  June 28, 2005

                   Respectfully Submitted,

                   SUSAN SHINKMAN
                   CHIEF COUNSEL
                   PENNSYLVANIA DEPARTMENT OF
                   ENVIRONMENTAL PROTECTION

By:    *Marianne Mulroy*
                   MARIANNE MULROY
                   Assistant Counsel
                   400 Waterfront Dr.
                   Pittsburgh, PA 15222-4745
                   (412) 442-4240

                   ROBERT A. REILEY
                   Assistant Counsel
                   400 Market Street
                   Harrisburg, PA  17105
                   (717) 787-0478

                   *Counsel for the Commonwealth of Pennsylvania,*
                   *Department of Environmental Protection; Local*
                   *Counsel for the States of Connecticut, Maryland,*
                   *New Jersey and New York*

RICHARD BLUMENTHAL
ATTORNEY GENERAL
STATE OF CONNECTICUT

By: *Kimberly Massicotte /s/ MM*

KIMBERLY MASSICOTTE*
LORI D. DiBELLA*
Assistant Attorneys General
55 Elm Street, P.O. Box 120
Hartford, Connecticut 06141-0120
(860) 808-5250

*Counsel for the State of Connecticut*


J. JOSEPH CURRAN, JR.
ATTORNEY GENERAL
STATE OF MARYLAND

By: *Susan F. Martielli /s/ MM*

SUSAN F. MARTIELLI*
KATHY M. KINSEY*
Assistant Attorney General
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
(410) 357-3704

*Counsel for the State of Maryland*


* Application for admission *pro hac vice* filed simultaneously with this complaint.

PETER C. HARVEY
ATTORNEY GENERAL
STATE OF NEW JERSEY

By: *Kevin Auerbacher /S/ MM*

KEVIN AUERBACHER*
JEAN REILLY
LISA MORELLI*
Deputy Attorneys General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
(609) 633-8109

*Counsel for the State of New Jersey*


ELIOT SPITZER
ATTORNEY GENERAL
OF THE STATE OF NEW YORK

By: *Andrew G. Frank /S/ MM*

ANDREW G. FRANK*
JACOB E. HOLLINGER*
Assistant Attorneys General
120 Broadway
New York, NY 10271
(212) 416-8446

J. JARED SNYDER
Assistant Attorney General
The Capitol
Albany, NY 12224
(518) 473-5843

*Counsel for the State of New York*

* Application for admission *pro hac vice* filed simultaneously with this complaint.

# CIVIL COVER SHEET

**05 0885**

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** Commonwealth of Pennsylvania, State of Connecticut, State of Maryland, State of New Jersey and State of New York

**DEFENDANTS** Allegheny Energy, Inc., Allegheny Energy Service Corporation, Allegheny Energy Supply Company, LLC, Monongahela Power Company, The Potomac Edison Co. and West Penn Power Co.

**(b)** County of Residence of First Listed Plaintiff    **Statewide**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Washington
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Please see attachment

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☒ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☒ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Clean Air Act, 42 U.S.C. § 7604(a)(3), 42 U.S.C. §§ 7470-92

Brief description of cause: failure to obtain permits and isntall pollution control equipment required by law.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND$ injunctive relief and civil penalties

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):
JUDGE                          DOCKET NUMBER

DATE  6-28-05

SIGNATURE OF ATTORNEY OF RECORD
Marianne Mulroy

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

CIVIL COVER SHEET

L (c)  Attorney's (Firm Name, Address and Telephone Number)

FOR THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION

Robert A. Reiley, Assistant Counsel
Commonwealth of Pennsylvania
Department of Environmental Protection
400 Market Street
Harrisburg, PA  17105
(717) 787-0478

Marianne Mulroy, Assistant Counsel
Commonwealth of Pennsylvania
Department of Environmental Protection
400 Waterfront Drive
Pittsburgh, PA  15222-4745
(412) 442-4262

FOR THE STATE OF CONNECTICUT

Kimberly Massicotte
Lori D. Dibella
Assistant Attorneys General
55 Elm Street, P.O. Box 120
Hartford, CT  06151-0120
(860) 808-5250

FOR THE STATE OF MARYLAND

Susan F. Martielli
Kathy M. Kinsey
Assistant Attorney General
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD  21230
(410) 537-3044

FOR THE STATE OF NEW JERSEY

Kevin Auerbacher
Jean Reilly
Lisa Morelli
Deputy Attorneys General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, NY  08625-0093
(609) 633-8109

FOR THE STATE OF NEW YORK

Andrew G. Frank
Jacob E. Hollinger
Assistant Attorneys General
120 Broadway
New York, NY  10271
(212) 416-8446

J. Jared Snyder
Assistant Attorney General
The Capital
Albany, NY  12224
(518) 473-5843

JS 44AREVISED OCTOBER, 1993

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

### THIS CASE DESIGNATION SHEET MUST BE COMPLETED

**PART A**

This case belongs on the ( _____Erie_____Johnstown____ X___ Pittsburgh) calendar.

    **ERIE CALENDAR** - If cause of action arose in the counties of Crawford, Elk, Erie, Forest, McKean, Venango

1.

    or Warren, OR any plaintiff or defendant resides in one of said counties.

2. **JOHNSTOWN CALENDAR** - If cause of action arose in the counties of Bedford, Blair, Cambria, Clearfield or Somerset OR any plaintiff or defendant resides in one of said counties.

3. Complete if on ERIE CALENDAR: I certify that the cause of action arose in _____ County and that the_____resides in_____County.

4. Complete if on JOHNSTOWN CALENDAR: I certify that the cause of action arose in_____ County and that the_____resides in_____County.

**PART B** (You are to check ONE of the following)

1. ____ This case is related to Number_____Judge_____.
2. _X_ This case is not related to a pending or terminated case.

**DEFINITIONS OF RELATED CASES:**

**CIVIL:** Civil cases are deemed related when a case filed relates to property included in another suit or involves the same issues of fact or it grows out of the same transactions as another suit or involves the validity or infringement of a patent involved in another suit

**EMINENT DOMAIN:** Cases in contiguous closely located groups and in common ownership groups which will lend themselves to consolidation for trial shall be deemed related.

**HABEAS CORPUS & CIVIL RIGHTS:** All habeas corpus petitions filed by the same individual shall be deemed related. All pro se Civil Rights actions by the same individual shall be deemed related.

**PART C**

I. **CIVIL CATEGORY** (Place x in only applicable category).

1.   ( )  Antitrust and Securities Act Cases
2.   ( )  Labor-Management Relations
3.   ( )  Habeas Corpus
4.   ( )  Civil Rights
5.   ( )  Patent, Copyright, and Trademark
6.   ( )  Eminent Domain
7.   (X)  All other federal question cases
8.   ( )  All personal and property damage tort cases, including maritime, FELA, Jones Act, Motor vehicle, products liability, assault, defamation, malicious prosecution, and false arrest
9.   ( )  Insurance indemnity, contract and other diversity cases.
10.   ( )  Government Collection Cases (shall include HEW Student Loans (Education), VA Overpayment, Overpayment of Social Security, Enlistment Overpayment (Army, Navy, etc.), HUD Loans, GAO Loans (Misc. Types), Mortgage Foreclosures, S.B.A. Loans, Civil Penalties and Coal Mine Penalty and Reclamation Fees.)

I certify that to the best of my knowledge the entries on this Case Designation Sheet are true and correct

Date: _June 28, 2005_

_Marianne Mulroy_

**ATTORNEY AT LAW**

**NOTE: ALL SECTIONS OF BOTH SIDES MUST BE COMPLETED BEFORE CASE CAN BE PROCESSED.**