IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, )
DEPARTMENT OF ENVIRONMENTAL )
PROTECTION, STATE OF CONNECTICUT, )
STATE OF MARYLAND, STATE OF NEW )
JERSEY, and STATE OF NEW YORK, )
          Plaintiffs, )
           )
          vs )  Civil Action No. 05-885
           )
ALLEGHENY ENERGY, INC., )
ALLEGHENY ENERGY SERVICE CORP., )
ALLEGHENY ENERGY SUPPLY CO., LLC, )
MONONGAHELA POWER COMPANY, )
THE POTOMAC EDISON COMPANY, and )
WEST PENN POWER COMPANY, )
          Defendants. )

REPORT AND RECOMMENDATION

I. Recommendation:

       It is respectfully recommended that the plaintiffs' motion for summary judgment

on claims 17 and 18 of the amended complaint (Document No. 132) be denied, that the

defendants' motion for partial summary judgment on claims 1-3, 6-9, and 12 of the amended

complaint (Document No. 135) be denied, and that the defendants' motion for summary

judgment on claims 4, 10, 15, 17, 19 and 23 of the amended complaint (Document No. 141) be

denied.

II. Report:

       Presently before the Court are motions for partial summary judgment submitted

by the parties.  For reasons discussed below, the parties' motions should be denied.

The plaintiffs are the Commonwealth of Pennsylvania, Department of Environmental Protection ("DEP"), and the States of Connecticut, Maryland, New Jersey and New York. On June 28, 2005, the plaintiffs filed their original complaint against defendants Allegheny Energy Service Corp., Allegheny Energy Supply Co., LLC, Monongahela Power Co., The Potomoc Edison Co., and West Penn Power Co. (collectively, "Allegheny") for alleged violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401, et seq., and Pennsylvania law.

On January 17, 2006, the plaintiffs amended their complaint against Allegheny. In the amended complaint, the plaintiffs set forth 26 claims for relief based on Allegheny's alleged violations of the CAA, the Pennsylvania Air Pollution Control Act (APCA"), 35 P.S. § 4001, et seq., and those Acts' implementing regulations. The plaintiffs' claims arise under several air pollution control schemes of the CAA, including the New Source Performance Standards ("NSPS"), 42 U.S.C. § 7411 and its implementing regulations, and the New Source Review ("NSR") program, which contains the Prevention of Significant Deterioration provisions of the Act, 42 U.S.C. §§ 7470-92 and its implementing regulations. The Court's federal question and supplemental jurisdiction are invoked.

In 1970, Congress enacted amendments to the CAA which broadened federal authority to combat air pollution, 84 Stat. 1676; those amendments directed the Environmental Protection Agency ("EPA") to devise National Ambient Air Quality Standards ("NAAQS") limiting permissible concentrations of certain pollutants which each state was obligated to enforce. 42 U.S.C. §§ 7409, 7410. To ensure NAAQS were maintained, Congress authorized the EPA to promulgate the NSPS, which required operators of stationary sources of air pollutants

to use the best technology for limiting pollution, both in newly constructed sources and in those undergoing a modification. 42 U.S.C. § 7411(a)(2).

In amendments to the CAA in 1977, Congress established the NSR permitting program, 91 Stat. 685. The NSR program consists of the Prevention of Significant Deterioration ("PSD") provisions and Non-Attainment New Source Review ("NNSR") provisions. PSD provisions apply to relatively unpolluted areas that have attained NAAQS, i.e., "attainment areas", whereas NNSR provisos apply to areas that have not met NAAQS ("non-attainment areas"). PSD provisions are meant to ensure that air quality in attainment areas does not decline to minimum levels permitted by NAAQS due to increases in annual emissions.

Allegheny owns and operates several coal-powered power plants in Pennsylvania, including at Armstrong, Hatfield's Ferry and Mitchell (the "Plants"). The plaintiffs complain that Allegheny undertook capital projects at the Plants, which had the effect of increasing its Plants' emissions. According to the plaintiffs, several projects undertaken by Allegheny at its Plants violated the CAA and Pennsylvania law, in that Allegheny modified and/or operated major emitting facilities at its Plants without applying for, or obtaining preconstruction permits and/or operating permits. Allegheny is also said to have reconstructed and operated units at a major emitting facility without abiding by emissions limitations required under the NSPS of the CAA and as required under Pennsylvania law. The plaintiffs also complain that Allegheny modified, reconstructed and operated major emitting facilities without obtaining plan approvals and permits and without abiding by emissions limitations required under PSD and NNSR regulations.

The plaintiffs contend that Allegheny operates its Plants without meeting the lowest achievable emission rate for both sulfur dioxide ("SO2") and nitrogen oxides ("NOx")

and without obtaining emission offsets as required by PSD and NNSR requirements. They complain that emissions of ozone-creating pollutants from Allegheny's Plants contribute to the formation of ozone in their states, which adversely affect the health of their residents and the quality of their water and air. The plaintiffs seek to permanently enjoin Allegheny from operating its Plants except in accordance with the CAA, the APCA and those Acts' implementing regulations. The plaintiffs also seek civil penalties against Allegheny for each violation of the above laws.

Following discovery, the parties moved for summary judgment on several claims in the amended complaint. The plaintiffs move for summary judgment on claims 17 and 18. As for Allegheny, they filed two motions: in one, Allegheny moves for partial summary judgment on claims 1-3, 6-9 and 12 on grounds they are barred, in whole or in part, by the applicable statute of limitations; in their second motion, Allegheny moves for summary judgment on claims 4, 10, 15, 17, 19 and 23. Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); <u>Biener v Calio</u>, 361 F.3d 206, 210 (3d Cir. 2004).

<u>Plaintiffs' motion for summary judgment on claims 17 and 18</u>:

In this motion (Document No. 132), the plaintiffs argue that Allegheny made modifications to Unit 2 of their Hatfield's Ferry Plant without complying with PSD permitting requirements set forth in 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21, and 25 Pa. Code §§ 127.81-.83. The plaintiffs contend that in 1999, when Allegheny replaced the lower slope panels and associated items at Hatfield's Ferry Unit 2 (the "Project"), it constituted a "modification", for

which Allegheny did not apply for or obtain a PSD permit.[1]

The plaintiffs' PSD claims pertaining to the Project arise under federal law in claim 17 and under Pennsylvania law in claim 18.[2]  Under the CAA, the PSD program is to be implemented by states under federally approved State Implementation Plans ("SIPs") that meet PSD requirements.  Regulations under both federal and Pennsylvania law have been established to implement the PSD provisions, see 40 C.F.R. § 52.21 and 25 Pa. Code §§ 127.81-.83; and Pennsylvania regulations incorporate the federal ones by reference.

The Hatfield's Ferry Plant is located in Greene County, PA.[3]  In 1978, the EPA concluded that Greene County was either in attainment or unclassifiable for both SO2 and NOx.[4] PSD provisions apply to sources in areas that are unclassified or in attainment with NAAQS. New York v. E.P.A, 413 F.3d 3, 12 (D.C.Cir. 2005).

Under PSD provisions, new and modified sources of pollution must obtain a PSD permit before performing certain "construction", which includes the "modification" of a facility, and show that their operations are in compliance with the best available control technology ("BACT").  See, 42 U.S.C. § 7475(a); New York v. E.P.A., 443 F.3d 880, 883 & n.1 (D.C.Cir.

---

1.    Under the CAA, a "modification" means "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. §7411(a)(4).

2.    Claims 17 and 18 allege other physical changes at Hatfield's Ferry Unit 2 in addition to the Project, but the plaintiffs seek summary judgment only as to the Project, which would be sufficient to establish liability on both of these claims.

3.    See, Allegheny's response No. 2 to plaintiffs' statement of material facts in support of their current motion.

4.    Id. at No. 3.

2006), cert. denied, 127 S.Ct. 2127 (2007). As is pertinent here, PSD regulations apply to "any major modification" at a "major stationary source". See, 40 C.F.R. § 52.21(i)(2).

The Hatfield's Ferry Plant is, and was at the time of the Project, a "major stationary source" as defined in 40 C.F.R. § 52.21(b)(1)(i)(b).[5] A "major modification" means "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i). The plaintiffs argue that the Project entailed a "major modification", as Allegheny made a "physical change" that was expected to increase emissions from the Hatfield's Ferry Plant, and hence, they were obligated to apply for or obtain a PSD permit, which they failed to do.

Conversely, Allegheny insists that the Project amounted to routine maintenance, repair and replacement ("RMRR") which is excluded from PSD requirements. They also argue that the plaintiffs have failed to show the Project caused an increase in actual annual emissions of SO2 or NOx sufficient to constitute a "major modification".

Under PSD regulations, "[a] physical change or change in the method of operations shall not include (a) Routine maintenance, repair and replacement". 40 C.F.R. § 52.21(b)(2)(iii)(a). To determine if a project falls within the RMRR exclusion, Courts engage in a case-by-case analysis, utilizing a multi-factor test that considers: (1) a project's nature and extent, (2) its purpose, (3) its frequency, and (4) its cost. See, Wisconsin Electric Power Co. v. Reilly, 893 F.2d 901, 910-913 (7th Cir. 1990) ("WEPCO"). Of these factors, "no single factor is dispositive." U.S. v. Cinergy Corp., 495 F.Supp.2d 909, 931 (S.D.Ind. 2007).

_____

5.    Id. at No. 1.

6

In conducting a RMRR analysis, there is a split of authority as to whether the above factors should be applied with reference to projects that are performed within the industry as a whole, or as to projects undertaken at a specific unit at issue. That is, courts are divided as to whether the RMRR exclusion should be applied to projects that are deemed "routine in the industry" (as Allegheny urges), or "routine at the unit" (as the plaintiffs propose). Unfortunately, PSD regulations do not define the scope of the RMRR exclusion.[6]

In examining prior rulings on the issue, our starting point is WEPCO, one of the seminal cases to address the scope of the RRMR exclusion. In WEPCO, the Seventh Circuit Court of Appeals accorded deference to the EPA in its interpretation of the RMRR exclusion ("we accord substantial deference to an agency's interpretation of its own regulations, especially with respect to technical and complex matters"), 893 F.2d at 910, after which the Court conducted its RRMR analysis with an eye toward whether the project before it was "routine in the industry", taking its lead from the EPA. Id. at 911-912.

For instance, in WEPCO, the Court stated:

> [T]o determine whether proposed work at a facility is routine, 'EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding.' Clay Memorandum at 3. The EPA considered all these factors in determining that the Port Washington project was not routine...

---

6. In contrast, under the NSPS program, EPA regulations provide that: "Maintenance, repair, and replacement from which the Administrator determines to be routine for a source category" shall not be considered a modification. 40 C.F.R. § 60.14(e)(1) (emphasis added). The United States Supreme Court has clarified that "PSD regulations on 'modification' simply cannot be taken to track the agency's regulatory definition under the NSPS." Environmental Defense v. Duke Energy Corp., 127 S.Ct 1423, 1434 (2007). "NSPS and PSD regulations are complementary and are not related as set to subset. Id. at 1436, n.8.

> [T]he EPA noted that far from being routine, the Port Washington project apparently was unprecedented: 'WEPCO did not identify, and EPA did not find, even a single instance of renovation work at any electric utility generating station that approached the Port Washington life extension project in nature, scope or extent,' Respondent's Brief at 44...
>
> For example, WEPCO presented the EPA with a list of forty air heaters in other plants that had been replaced without triggering NSPS or PSD provisions... Obviously, the precise nature of the physical change is a material factor in determining whether the change is routine, and for this purpose it is important that the subject of past EPA practice be closely comparable with the change under consideration here ... WEPCO has not demonstrated that the EPA's conclusion that the forty other air heater replacements were dissimilar is arbitrary and capricious...

Id.

Following WEPCO, the EPA clarified its interpretation of RMRR in the Federal Register. Specifically, on July 21, 1992, the EPA opined: "the determination of whether the repair or replacement of a particular item of equipment is 'routine' under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category." 57 Fed. Reg. 32,314, 32,326 (July 21, 1992) (emphasis added). This stance appears to comport with the Court's ruling in WEPCO, which deferred to the EPA's original interpretation of RMRR.

In subsequent litigation, however, the EPA narrowed its interpretation of RMRR. As articulated in United States v. Southern Ind. Gas & Elec. Co., 245 F.Supp.2d 994, 1008 (S.D. Ind. 2003) ("SIGECO"), the EPA asserted that the RMRR exemption has three hallmarks: "First, the exemption applies to a narrow range of activities, in keeping with the EPA's limited authority to exempt activities from the [CAA]. Second, the exemption applies only to activities that are

routine for a generating unit. The exemption does not turn on whether the activity is prevalent within the industry as a whole. Third, no activity is categorically exempt."

In <u>SIGECO</u>, the Court recognized that "the test the EPA urges in this case is slightly more specific than the way the EPA defined routine maintenance in <u>WEPCO</u>." <u>Id.</u> at 1018. Still, the Court found that the EPA's narrow interpretation of RMRR was reasonable, and it accorded deference to its position. <u>Id.</u> at 1009-1010. In subsequent actions, the EPA continued to press its "three hallmarks of RMRR" position, and the plaintiffs here have adopted it.

In a line of cases espoused by the plaintiffs, other Courts joined <u>SIGECO</u>'s ruling that the EPA's narrow interpretation of RMRR was reasonable, finding that the exemption applies only to activities that are routine for a generating unit (and does not turn on whether the activity is prevalent within the industry). See, <u>Cinergy Corp.</u>, 495 F.Supp.2d at 931; <u>Sierra Club v. Morgan</u>, 2007 WL 3287850, at *12 (W.D.Wis., Nov. 7, 2007); <u>New York v. American Elec. Power Serv. Corp.</u>, 2007 WL 539536 (S.D.Ohio, Feb. 15, 2007), citing <u>United States v. Ohio Edison Co.</u>, 276 F.Supp.2d 829, 856 (S.D.Ohio 2003). Interestingly, despite according deference to the EPA's narrow interpretation of RMRR, several Courts in this camp have ruled that one factor in the analysis -- the "frequency" factor -- should be assessed with reference to projects that are performed <u>both</u> in the industry and at a particular unit. <u>Cinergy Corp.</u>, 495 F.Supp.2d at 930-931 ("frequency" factor in RMRR analysis includes consideration of "how frequently a type of repair or replacement is done at a particular unit as well as how frequently it is done within the industry"); <u>SIGECO</u>, 245 F.Supp.2d at 1016 ("<u>WEPCO</u> supports the view that the frequency of the project at the particular unit and the frequency of the project within the industry are *both* relevant considerations") (emphasis in original). <u>Ohio Edison</u>, 276 F.Supp.2d at 887 (noting that

WEPCO decision made it clear that activities performed in the industry are relevant in analyzing the "frequency" factor). Here, the plaintiffs do not object to analyzing the "frequency" factor in this dual manner.

In contrast to the above-cited cases, other Courts have interpreted the RMRR exemption as the EPA originally did, holding that projects should be analyzed under WEPCO's multi-factor test with reference to whether they were "routine in the industry". See, United States v. East Kentucky Power Cooperative, 498 F.Supp.2d 976, 993-994 (E.D.Ky. 2007); United States v. Alabama Power Co., 372 F.Supp.2d 1283, 1307 (N.D. Ala. 2005); United States v. Duke Energy Corp., 278 F.Supp.2d 619, 638 (M.D.N.C. 2003) ("Duke I"), aff'd. on other grounds, 411 F.3d 539 (4th Cir. 2005), vacated by, 127 S.Ct. 1423 (2007). In these cases, Courts have not accorded deference to the EPA's narrow interpretation of RMRR due to the agency's conflicting guidance on the issue after WEPCO.

As explained in Duke I, supra:

The EPA's position on WEPCO's life extension project and life extension projects in general confirms the understanding that projects which are routine in the industry qualify as RMRR. To reconcile the EPA's previously stated position with its litigation position that RMRR applies only to routine activities performed at an individual unit, one must assume that a generating unit routinely and repetitively undergoes life extension projects. This assumption defies common sense. Further, this is an assumption the EPA explicitly rejected when it assumed for the purpose of assessing future utility air emission trends that coal-fired generating utilities would undergo life extension refurbishment once around age thirty (citation omitted).

Through the EPA's statements in the Federal Register, its statements to the regulated community and Congress, and its conduct for at least two decades the EPA has established

10

an interpretation of RMRR under which routine is judged by reference to whether a particular activity is routine in the industry...

278 F.Supp.2d at 637.

Similarly, in <u>East Kentucky Power Cooperative</u>, <u>supra</u>, the Court recognized:

[W]hen an agency has interpreted one of its regulations in a consistent manner, that interpretation is controlling, unless plainly erroneous or inconsistent with the statute. However, when, as here, the regulatory agency takes an inconsistent view of the regulations, makes inconsistent statements with respect to the regulation, and also enforces the regulation with no discernable consistency (which was the situation at least as of the time the work at issue in this case commenced), the weight to be given that position diminishes considerably in the Court's view."

498 F.Supp.2d at 993, citing <u>Good Samaritan Hosp. v. Shalala</u>, 508 U.S. 402, 417 (1993). Thus, in <u>East Kentucky Power Cooperative</u>, the Court held it would analyze the RMRR exclusion "by applying the <u>WEPCO</u> multi-factor test -- nature and extent, purpose, frequency, and cost -- with reference to the industry as a whole, not just the particular... unit at issue." 498 F.Supp.2d at 993. Accord, <u>Alabama Power Co.</u>, <u>supra</u>, 372 F.Supp.2d at 1306 ("Given the EPA's zigs and zags represented by its contradictory post-<u>WEPCO</u> statements and rules... the court cannot say that EPA's interpretation of its rules is due to be afforded ... deference. EPA admits, as it must, that it has not spoken with one voice, or a consistent voice, or even a clear voice on the issue.").

Allegheny aligns themselves with these cases, arguing that the issue of whether their Project was RMRR should be analyzed under the EPA's original "routine in the industry" approach -- which was how EPA interpreted RMRR in 1984 when it approved amendments to the Pennsylvania SIP which incorporated by reference federal PSD regulations. See, 49 Fed.

Reg. 33,127 (Aug. 21, 1984).[7]  Allegheny asserts that from 1984 until initiation of this suit, DEP

interpreted RMRR under PSD rules with reference to whether a project was "routine in the

industry", and it should not be permitted to abandon that longstanding interpretation of RMRR as

implemented in the Pennsylvania SIP without revising the SIP.

At this juncture, the Third Circuit Court of Appeals has not weighed in on the

The plaintiffs do not dispute that DEP (like EPA) has modified its interpretation

of RMRR.  The plaintiffs aver, however, that claims 17 and 18 arise under PSD regulations as

they existed in 1999 when the Project was performed, not as they existed in 1984 when

amendments to Pennsylvania's SIP were approved.  The plaintiffs explain that federal PSD

regulations were changed in 1992, see 57 Fed. Reg. 32,314 (July 21, 1992), and those changes

were automatically incorporated into Pennsylvania's PSD regulations and its SIP.[8]  As discussed

above, the aforesaid provision of the Federal Register appears to support Allegheny's position,

for the EPA clarified therein that:

> the determination of whether the repair or replacement of
> a particular item of equipment is 'routine' under the NSR
> regulations, while made on a case-by-case basis, must be
> based on the evaluation of whether that type of equipment
> has been repaired or replaced by sources within the relevant
> industrial category. (Emphasis added).

57 Fed. Reg. 32,314, 32,326 (July 21, 1992).

At this juncture, the Third Circuit Court of Appeals has not weighed in on the

7.    As Allegheny explains, in 1983, Pennsylvania added a provision to its administrative code,
25 Pa. Code § 127.83, to adopt and incorporate by reference federal PSD regulations.  EPA
approved the adoption of said regulations in the Pennsylvania SIP effective October 22, 1984.
See, 49 Fed. Reg. 33,127 (Aug. 21, 1984).

8.    See, plaintiffs' response No. 58 to Allegheny's statement of material facts opposing the
current motion.

PSD program's RMRR exclusion. In other contexts, the Court has stated that "an agency's interpretation of its own regulation is controlling unless 'plainly erroneous or inconsistent with the regulation.'" Star Enterprise v. U.S. E.P.A., 235 F.3d 139, 147 (3d Cir. 2000), quoting Auer v. Robbins, 519 U.S. 452, 461 (1997). The Court also has instructed that "less deference should be accorded to administrative interpretations that lack consistency". Sacred Heart Medical Center v. Sullivan, 958 F.2d 537, 544 (3d Cir. 1992). Indeed, "Courts do not accept a revision in administrative interpretation when it 'flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute.'" Mazza v. Secretary of Health and Human Services, 903 F.2d 953, 959 (3d Cir. 1990), quoting General Elec. Co. v. Gilbert, 429 U.S. 125, 142 (1976). Although "an agency is not locked into the first interpretation it espouses.... the agency must offer a 'reasoned justification' for the change in its interpretation of a statute or a modification of its policy." Sacred Heart Medical Center, supra, 958 F.2d at 544, citing Mazza, supra, 903 F.3d at 959.

Here, the plaintiffs have not explained why DEP deviated from its original interpretation of RMRR, nor do they ask this Court to accord deference to the DEP's current stance on RMRR. And we do not. Instead, we will follow the lead of the Courts in WEPCO, 893 F.2d at 911-912, East Kentucky Power Cooperative, 498 F.Supp.2d at 993-994, Alabama Power Co., 372 F.Supp.2d at 1307, and Duke I, 278 F.Supp.2d at 638, which hold that the RMRR exclusion should be analyzed by looking at whether a project was routine in the industry as a whole. This interpretation of RMRR under the PSD program is consistent with EPA regulations under the complementary NSPS program, which provide that: "Maintenance, repair, and replacement from which the Administrator determines to be routine for a source category"

shall not be considered a modification. 40 C.F.R. § 60.14(e)(1) (emphasis added). It also comports with the DEP and EPA's original interpretations of RMRR as recited above.

Courts hold that the RMRR exclusion is "limited to *de minimus* circumstances". New York, supra, 443 F.3d at 884; Ohio Edison, supra, 276 F.Supp.2d at 888. This does not mean, as the plaintiffs suggest, that the exemption applies only to activities that are routine for a generating unit; rather, it means "that only *de minimus* activities ... serve to trigger the routine maintenance exemption." Ohio Edison, 276 F.Supp.2d at 888. For instance, in Ohio Edison, the Court characterized RMRR as follows: "[r]outine maintenance, repair and replacement occurs regularly, involves no permanent improvements, is typically limited in expense, is usually performed in large plants by in-house employees, and is treated for accounting purposes as an expense." 276 F.Supp.2d at 834. In contrast, "capital improvements ... generally involve more expense, are large in scope, often involve outside contractors, involve an increase of value to the unit, are usually not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet." Id.

The party claiming the benefit of the RMRR exemption bears the burden of proving its applicability. See, East Kentucky Power Cooperative, 498 F.Supp.2d at 995; Sierra Club, 2007 WL 3287850, *12; Cinergy Corp., 495 F.Supp.2d at 931; Ohio Edison, 276 F.Supp.2d at 856. Also see, e.g., Berckeley Inv. Group. v. Colkitt, 455 F.3d 195, 212 (3d Cir. 2006) ("The burden of proving entitlement to an exemption rests with the party claiming the entitlement."). Here, in analyzing the Project's nature and extent, its purpose, the frequency of the repair or replacement, and its cost, Allegheny has not shown that the Project was RMRR.

The record shows that Allegheny began planning for the Project in early 1995, more than four years before it was completed.[9]  The Project was undertaken during an outage that began on September 3, 1999 and ended on November 26, 1999, when Allegheny removed the existing lower slope panels, inlet headers, seal skirt, and ash hopper at Hatfield's Ferry Unit 2 and replaced those items with newly fabricated materials which Allegheny described as "an improved design" and "a redesign of the lower furnace area".[10]

Each new slope panel on the Project included 464 tubes[11]; and each slope tube panel was approximately 60 feet wide.[12]  The lower slope tube panels replaced during the Project represented about 1% of the total heating surface area of the boiler.[13]  While the Project was the first time that the lower slope panels were replaced in their entirety at Unit 2[14], Allegheny had previously performed similar projects at Hatfield's Ferry Units 1, 3 and elsewhere in its system.[15]

The Project required a 12-week outage to perform, plus additional pre-outage time to build a platform and a monorail system to allow the new materials to be transported and

---

9.　See, Allegheny's response No. 18 to plaintiffs' statement of material facts in support of their current motion.

10.　Id. at No. 11.

11.　Id. at No. 26.

12.　Id. at No. 27.

13.　See, plaintiffs' response No. 59 to Allegheny's statement of material facts opposing the current motion.

14.　Id.

15.　Id. at No. 61.

15

installed.[16]  Allegheny hired outside contractors to fabricate the new materials and to do the

demolition, removal and installation work required by the Project[17], even though Allegheny

employed an in-house maintenance staff at Hatfield's Ferry that was responsible for such tasks as

changing oil and gear boxes, replacing light bulbs, and replacing bearings in pumps and fans.[18]

Based on these facts, the "nature and extent" of the Project does not appear to be

consistent with RMRR.  Although Allegheny's expert, Jerry Golden, opines that the "slope

replacement project at Hatfield Unit 2 was consistent with the nature of other maintenance repair

and replacement activities performed elsewhere on the Allegheny system and at other electric

utilities throughout the country"[19], Allegheny has not demonstrated that the nature and extent of

the Project was "routine".  Rather, as the plaintiffs point out, in cases where construction projects

involve extensive replacements, design upgrades, use of improved materials, use of outside

contractors, and the building of structures such as a monorail to facilitate the work, as here,

Courts find that such projects are not RMRR.  See, Cinergy Corp. 495 F.Supp.2d at 943-44

(replacement of reheater tubes at Gibson Station Unit 2 was not routine, where upgraded tubes

were fabricated, outside contractors performed the installation, the project was expected to take

three months, and a monorail was installed to assist with it); Id. at 944 (replacement of slope

_____

16.   See, Allegheny's response No. 28 to plaintiffs' statement of material facts in support of
their current motion.

17.   Id. at No. 25.

18.   Id. at No. 13.

19.   See, Allegheny's Exhibit 51 at p. 75.

tubes at Miami Fort Station Unit 5 was not routine, where the project was performed by outside

contractors, it involved a new configuration, and it took eleven weeks to complete); Sierra Club,

2007 WL 3287850 at *14 (2002 boilers project was not RMRR, as it involved replacing all of the

economizers with newly-fabricated ones, was done by outside contractors, and took longer than a

normal maintenance project).  Mr. Golden's averments that 28 outside contractors worked on the

Project during the outage, and that the 84 days needed to complete the Project "was a relatively

long outage by Allegheny's standards [albeit, not their longest][20], does not evince RMRR.

In contrast, we cannot say as a matter of law that the "purpose" of Allegheny's

Project is inconsistent with RMRR.  In a 1998 capital expenditure authorization request,

Allegheny described the "purpose & necessity" of the Project as follows:

> Frequent forced outages have occurred on the Hatfield No. 2
> boiler due to leaks in the lower furnace slope tubes and
> around the ash hopper seal skirt.  Replacing the tube panels
> and seal skirt will minimize future maintenance costs and
> will improve the availability and reliability of the boiler to
> better meet the needs of Generation Marketing.[21]

When the purpose of a project is to extend the life of the unit beyond its planned

retirement date, it supports a finding that the work is not RMRR.  WEPCO, 893 F.2d at 911-912.

Here, the purpose of the Project was not life extension of the unit.  As Mr. Golden asserts: "The

slope replacement at Hatfield Unit 2 was performed to avoid future forced or maintenance

outages and reduce maintenance cost.  These objectives are totally consistent with the

---

20.    Id. at pp. 75-76.

21.    See, Allegheny's response No. 17 to plaintiffs' statement of material facts in support of
their current motion.

fundamental purpose of all maintenance, repair, and replacement activities at a generating unit."[22]

Some Courts have ruled that if a project's purpose is to minimize leaks and forced outages, save money by limiting future repairs and maintenance, or improve a unit's availability and reliability, it supports a finding that the work is not routine. Cinergy Corp., 495 F.Supp.2d at 938, 941; Sierra Club, 2007 WL 3287850 at *13; Ohio Edison, 276 F.Supp.2d at 860-61. Such a determination, however, must be made on a case by case basis. WEPCO, 893 F.2d at 910. Here, Allegheny's above-recited purposes for the Project do not include extending the life of the unit, and they seemingly encompass a large spectrum of maintenance, repair and replacement activities. Based on the record, we cannot say that the purpose of the Project is inconsistent with RMRR.

Insofar as the Project's "frequency of repair or replacement", Allegheny admits that the Project entailed the first time the lower slope panels were replaced in their entirety at a unit that had been in service for 29 years.[23] Based on the Project's first wholesale replacement of the lower slope panels, Allegheny assumed the Project would have a 30-year "benefit period".[24] However, when the Project did not work out as planned, Allegheny replaced the same lower slope tube panels at Hatfield's Ferry Unit 2 in 2006.[25] Courts hold that "[s]uch infrequent

---

22. See, Allegheny's Exhibit 51 at p. 76.

23. See, Allegheny's response No. 32 to plaintiffs' statement of material facts in support of their current motion.

24. Id. at No. 21.

25. See, plaintiffs' response No. 63 to Allegheny's statement of material facts opposing the current motion.

replacement[s] can hardly be considered routine." Sierra Club, 2007 WL 3287850 at *15 (infrequent replacement of economizers, which were "expected to be replaced every 24 years" does not evince RMRR); Cinergy Corp., 495 F.Supp.2d at 938-39 (where "the project marked the first and only time in the Unit's history that all of the tubes for the front reheater pendants were replaced in a single outage", the frequency factor weighed against RMRR); Ohio Edison, 276 F.Supp.2d at 861 (projects "considered once or twice in a unit's lifetime" are not routine); accord, WEPCO, 893 F.2d at 911-912.

Still, Mr. Golden asserts that "replacement of sections of waterwall tubing, including lower waterwall and slope tubing is an activity that is performed frequently in the electric utility industry."[26] According to Mr. Golden, based on a summary of projects undertaken by 147 separate generating units which the plaintiffs allege violated NSR, 90 projects were performed that involved replacement of all or a significant portion of waterwall tubing, sixteen of which were performed on lower waterwall or slopes.[27] No evidence shows, however, the scope of such projects, or their expected duration. Here, Allegheny's Project involved the total replacement of the lower slope panels -- which occurred for the first time in the 29 year life of the unit and had an assumed 30 year benefit period. Allegheny has not shown that the "frequency" of such work supports a finding it was RMRR.

The cost of the Project also does not evince RMRR. The total cost of the Project was $6,342,917.52, of which $811,754.37 was the cost of removal and $5,531,163.15 entailed

_____

26. See, Allegheny's Exhibit 51 at p. 77.

27. Id.

19

capital costs expended.[28]  In contrast, in 1998, Allegheny estimated that "annual maintenance costs" for Unit 2's furnace lower slope area, seal trough and ash hopper were $25,000.[29]  Allegheny treated the cost of the Project as a capital expenditure, not as a maintenance expense[30]; but Mr. Golden avers that the Project was classified as capital work in accordance with Allegheny and industry accounting practices.[31]

Mr. Golden reports that the Project was performed at a cost of approximately $12/kW, which was about 4% of the cost of the WEPCO Port Washington project (which cost about $323/kW and was ruled not RMRR).[32]  Golden also avers that the cost of the Project was from 4.5% to 6.5% of the cost of the Cincinnati Beckjord 1 and Beckjord 3 life extension projects (which cost $262/kW and $183/kW respectively and for which EPA found no violations).[33]  Nonetheless, by way of comparison, the cost of replacing the lower slope tubes at Mitchell Unit 3 was about $527,000.[34]

Courts hold that when a project is relatively expensive and is treated as a capital expenditure rather than a maintenance cost, as here, it weighs against a finding of RMRR.  See,

_____

28.  See, Allegheny's response No. 29 to plaintiffs' statement of material facts in support of their current motion.

29.  See, plaintiffs' Exhibit 24 at AE_DUN_00131797, and plaintiffs' Exhibit 22 at AE_DUN_00131832.

30.  See, Allegheny's response No. 31 to plaintiffs' statement of material facts in support of their current motion.

31.  See, Allegheny's Exhibit 51 at p. 75.

32.  Id. at pp. 76, 78.

33.  Id.

34.  See, plaintiffs' Exhibit 37 at p. 123.

Cinergy Corp., 495 F.Supp.2d at 939 (cost of lower slope tube replacement project "was not routine" where it cost $2,145,000 [less than the Project cost here] and was treated as a capital expense rather than an annual maintenance cost); Sierra Club, 2007 WL 3287850 at *17 (total project cost of $1,712,348, treated as a capital expenditure under GAAP, was not routine). Based on the record before us, the cost of the Project is not RMRR.

Having analyzed the pertinent factors, we find that Allegheny has not met their burden of proving that the Project was routine. Hence, the RMRR exclusion does not apply to it.

We must now discern whether the Project constituted a "major modification" so as to trigger PSD requirements. The plaintiffs bear the burden of proof on this issue. See, East Kentucky Power Cooperative, 498 F.Supp.2d at 995; Sierra Club, 2007 WL 3287850 *12.

As discussed above, a "major modification" means "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any [regulated] pollutant" (which here, involves SO2 and NOx). See, 40 C.F.R. § 52.21(b)(2)(i). A "net emissions increase" means (a) "any increase in actual emissions from a particular physical change or change in method of operation at a stationary source", and (b) "any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable." See, 40 C.F.R. § 52.21(b)(3)(i)(a)&(b). A "significant" net emissions increase means, with respect to SO2 and NOx, a net emissions increase of 40 tons per year or greater, or the potential to emit those pollutants at said rates. 40 C.F.R. § 52.21(b)(23)(i).

As noted above, the plaintiffs insist the Project was a "major modification", because it resulted in a "physical change" at Hatfield's Ferry Unit 2, and Allegheny should have

anticipated the change would significantly increase emissions of SO2 and NOx there.  Courts

hold that "an owner or operator must make a preconstruction projection of whether and how

much emissions will increase at a particular unit following construction."  U.S. v. Cinergy Corp.,

384 F.Supp.2d 1272, 1276 (S.D. Ind. 2005), aff'd., 458 F.3d 705 (7th Cir. 2006), cert. denied, 127

S.Ct. 2034 (2007).  Accord, Ohio Edison, stating that "PSD regulations require a pre-

construction evaluation of whether the change would result in a significant net emissions increase

of any pollutant subject to regulation under the Act.", 276 F.Supp.2d at 863, and that "the [CAA]

clearly requires that this calculation be made by the electric utility *before* the physical change is

actually undertaken".  Id. at 865 (emphasis in original).  The Court of Appeals in Cinergy Corp.

explained: "what is required for determining whether a construction permit must be sought for a

planned physical change in the plant is not prescience, but merely a reasonable estimate of the

amount of additional emissions that the change will cause".  458 F.3d at 709.

      Prior to implementing the Project, Allegheny did not perform a pre-construction

emissions calculation to determine what the post-Project emissions would be for SO2 and NOx.[35]

According to Allegheny, that is because they did not believe the Project would result in

significant net emissions of any pollutant.[36]

      Conversely, the plaintiffs and their expert, Richard Rosen, Ph.D., believe that

Allegheny was remiss in failing to evaluate pre-Project emissions projections.  As discussed

below, Dr. Rosen used a methodology for making calculations which show that Allegheny's

Project would result in emissions increases of 404 tons per year of SO2, and 64 tons per year of

---

35.   See, plaintiffs' Exhibit 10 (July 27, 2007 deposition of Clark Colby) at p. 71.

36.   See, Allegheny's Exhibit 146 (July 27, 2007 deposition of Clark Colby) at pp. 54-55.

NOx, which entail "significant" emissions increases so as to trigger PSD requirements.[37] Dr. Rosen made his findings by calculating "actual-to-projected-future-actual" emissions at Hatfield's Ferry Unit 2, which compares a "baseline" level of emissions (i.e. pre-change emissions at Unit 2) with a projection of post-Project emissions there.[38]

In making his calculations, Dr. Rosen utilized data submitted by Robert Koppe which analyzed Allegheny's Generating Availability Data System ("GADS") filings. As Dr. Rosen explains, "[t]he "GADS" methodology relied on by Mr. Koppe involved reviewing Allegheny's filings with the North American Electric Reliability Council ("NERC"), to determine the forced outage hours attributed to the component before the activity as compared to the outage hours related to the component after the activity." According to Dr. Rosen, "[t]his analysis shows a direct causal relationship between the activity and the elimination or reduction of forced outages associated with the component at issue. By reducing forced outages, Allegheny naturally increased the hours that the unit was operating (generating power), thereby increasing its emissions."[39]

Based on the GADS data, Dr. Rosen first calculated the "baseline" level of emissions prior to the Project. He then compared the emissions during the "baseline" period with the forecasted level of emissions after the Project.[40]

In Ohio Edison, the Court instructed that "[t]he first step in the [pre-construction]

---

37. See, plaintiffs' Exhibit 42.

38. See, plaintiffs' Exhibit 40 at pp. 11, 15-16.

39. Id. at p. 3 & n.5.

40. Id. at p. 11.

analysis is to determine the actual emissions before the proposed change. This is referred to as the 'baseline emissions' and is expressed in average tons of pollutants emitted per year." 276 F.Supp.2d at 863. In calculating baseline emissions for activities after July 21, 1992 (as here), "a utility may use 'any 2 consecutive years within the 5 years prior to the proposed change [as] representative of normal source operations for a utility.'" Id. at 864, quoting 57 Fed. Reg. 32323 (July 21, 1992).

In his "actual to projected future actual" calculations, Dr. Rosen chose February 1997 through January 1999 as the "baseline" period of emissions.[41] He did so "by calculating the actual emissions for all months in the five years prior to the activity", after which he "was able to identify the sequential 24-month period that most closely yielded 24 months of the average actual monthly emissions of the five-year period."[42]

Next, Dr. Rosen "compared the average annual emissions in those 24 months, expressed in tons-per-year, to the projected future annual emissions in the post activity period."[43] As Dr. Rosen explains, he compared the emissions during the baseline period with the forecasted level of emissions "due to the expectation that the availability of the plant components replaced would improve due to fewer forced outages during the subsequent five-year period <u>after</u> the activity. This scenario is based directly on Mr. Koppe's analysis of the GADS availability data, heat rate, and net dependable capacity data for the Allegheny generating units, and his projections

---

41. See, plaintiffs' Exhibit 42.

42. See, plaintiffs' Exhibit 40 at p. 27.

43. Id.

for the five years following the project."[44]

Allegheny challenges Dr. Rosen's findings, arguing that his methodology is unreliable, is based on flawed assumptions, and the accuracy of his projections in this case are almost always wrong. As such, Allegheny insists that Dr. Rosen's findings are inadmissible and cannot support the plaintiffs' motion for summary judgment.

Specifically, Allegheny asserts that Dr. Rosen's methodology for projecting post-Project emissions increases is unreliable, because he premised his methodology on flawed assumptions that repairs or replacements to individual components at Allegheny's generating units always lead to increased unit availability, which always lead to increased emissions, but such assumptions are contradicted by the facts in this case. Allegheny asserts that contrary to Dr. Rosen's assumptions, repairs to individual components at their generating units did not always lead to increased availability, or to increased generation or emissions. Allegheny points out that Dr. Rosen never tested the accuracy of his projections in this case prior to preparing his expert report[45] -- a fact which they believe undermines the reliability of his methodology.

In contrast, Allegheny's expert, Frank C. Graves, examined the reliability of Dr. Rosen's method for projecting emissions increases by comparing his projections at several Allegheny projects to their actual emissions outcomes. Mr. Graves avers that "actual emissions nearly always fell, when [Dr. Rosen's] method projects they all should have increased."[46]

_____

44. Id. at p. 11. In plaintiffs' memorandum in support of their current motion at pp. 10-13, they set forth a five-step process utilized by Dr. Rosen for making his emissions calculations.

45. See, Allegheny's Exhibit 135 at pp. 84-85.

46. See, Allegheny's Exhibit 52 at p. 26.

According to Mr. Graves,

> in those instances where the emissions did increase, the plant performance circumstances surrounding the increases disprove the theory of causation that Dr. Rosen advances. Under his theory, component repairs increase unit availability; increased unit availability leads to higher capacity factors (more generation); and higher capacity factors lead to higher emissions. This combination of outcomes <u>never</u> occurs in the projects that Dr. Rosen evaluates, even under alternative baseline assumptions. (emphasis in original).[47]

Mr. Graves asserts that he analyzed a range of alternative baselines, "including the 24-month period with the highest SO2 emissions, the 24-month period with the highest NOx emissions, the 24-month period with the lowest outage hours attributed to the component (highest component availability) and the 24-month period immediately before the repair", and he found that "[e]missions after the projects were lower than the baseline emissions almost all of the time, no matter which baseline period was chosen."[48] Mr. Graves reports that "not a single project (out of 8) exhibited the results assumed in Dr. Rosen's methods (that unit availability, generation, and emissions will increase) when evaluated over 5 distinct baseline periods."[49]

In <u>Ohio Edison</u>, the Court noted that "actual emissions data, while interesting, is not dispositive of the matter to be resolved ... It is the projected net emissions increase that the Defendant could have predicted prior to the projects being undertaken that determines whether there is a CAA violation." 276 F.Supp.2d at 884-885. To support their claim that Allegheny should have projected significant emissions increases at Unit 2 following the Project, the

---

47. Id. at p. 27.

48. Id.

49. Id. at pp. 27-28.

plaintiffs rely solely on Dr. Rosen's opinions and methodology.

Frank C. Graves opines that Dr. Rosen's methods for forecasting emissions is inaccurate because:

> Dr. Rosen assumes an increase in future generation (and therefore, emissions) in response to any projected improvement in component availabilities... There is no possibility of the method projecting a decrease, because it assumes all prior lost availability is recaptured while all other performance and usage factors of the plant and its fuel remain constant. Since one factor is increasing and all others are held constant, there is a *per se* increase in the projected emissions... (emphasis in original).[50]

Mr. Graves avers that "[a]ny method which is only capable of projecting an increase, when there are numerous system factors that can and do cause decreases... is clearly not a credible method for projecting emissions."[51]

Allegheny also argues that Dr. Rosen based his calculations on GADS data provided by Robert Koppe, but Mr. Koppe's data was inaccurate, and his computation of outage hours at Hatfield's Ferry Unit 2 was incorrect. Allegheny has submitted the affidavit of William Linhart, a Senior Consulting Engineer with Allegheny Energy Inc.'s Technical Services Group, who avers that he compared Mr. Koppe's analysis of the event data for Unit 2 as reported by NERC and found errors in Koppe's conclusions as to the cause of outages there.[52]

William Linhart asserts in his affidavit:

With regards to the lower slope of Unit 2, Mr. Koppe

---

50. Id. at p. 19.

51. Id.

52. See, Allegheny's Exhibit 142 (affidavit of William Linhart at ¶¶ 6-7).

identified a tube leak in the unit's lower slope as the cause of an outage at Unit 2 on May 24, 1996. This is inaccurate. This outage was in fact, due to a malfunction in Unit 2's bottom ash gate... This malfunctioning bottom ash gate was not replaced during the 1999 outage at Hatfield Unit 2 at issue in this litigation; rather, the original ash gate was reused.

Moreover, according to the GADS data, the May 24, 1996 outage was a maintenance outage that occurred during a period when Unit 2 was on Reserve Shutdown, a period when a unit's operation is not required. Accordingly, on May 24, 1996, there were no lost hours of operation at Hatfield Unit 2 due to any outage caused by a leak in the lower slope tube panels.

Similarly, Mr. Koppe identifies a tube leak in Unit 2's lower slope tube panels as the cause of an outage on September 27, 1998. Although the GADS data lists this event as a boiler tube leak, the actual reasons for the outage on this date was the de-slagging of the secondary superheater...[53]

Allegheny contends that Mr. Koppe's errors significantly impacted the reliability of Dr. Rosen's calculations. As discussed above, Dr. Rosen calculated his "baseline" level of emissions and derived his actual-to-projected-future-actual calculations on Mr. Koppe's analysis of the GADS availability data.[54] Mr. Koppe's GADS data was used to "determine the forced outage hours related to the component after the activity", from which Dr. Rosen opined that Allegheny increased the hours their unit was operating and thereby increased its emissions.[55] If Mr. Koppe's data was inaccurate, it could have affected the reliability of Dr. Rosen's calculations.[56]

---

53. Id. (at ¶¶ 7-10).

54. See, plaintiffs' Exhibit 40 at p. 11.

55. Id. at p. 3, n.5.

56. In a rebuttal report, Dr. Rosen revised his emissions forecasts after learning of errors in
(continued...)

NSR provisions require that a unit's "physical or operational change 'result in' an increase in actual emissions in order to consider that change to be a modification". 57 Fed. Reg. 32314, 32326 (July 21, 1992), citing 40 C.F.R. § 52.21(2)(i). "EPA declines to create a presumption that every emissions increase that follows a change in efficiency is inextricably linked to the efficiency change." 57 Fed. Reg. 32327. Thus, the issue of whether emissions increases are related to a physical or operational change "is a fact-dependent determination that must be resolved on a case-by-case basis." Id.

Based on the record before us, which contains conflicting reports from Dr. Rosen and Mr. Graves, a material issue of fact exists as to whether Allegheny should have projected a significant increase in annual emissions to result from their Project. Accordingly, summary judgment is not appropriate on claims 17 and 18.

Allegheny's motion for partial summary judgment on claims 1-3, 6-9 and 12:

In this motion (Document No. 135), Allegheny argues that several of the plaintiffs' claims are time-barred. Specifically, Allegheny insists that claims 1 and 7 are barred by the federal statute of limitations, 28 U.S.C. § 2462, while claims 2-3, 6, 8-9 and 12 are barred by the Pennsylvania statute of limitations.

In claims 1 and 7, the plaintiffs complain that Allegheny failed to comply with preconstruction permitting requirements under the CAA when they made modifications to Units 1 and 2 at their Armstrong Plant in 1994 and 1995. The plaintiffs seek both civil penalties and injunctive relief on these claims. Since the CAA has no specific statute of limitations provision,

---

56. (...continued)
some GADS data he was provided. See, plaintiffs' Exhibit 41 at pp. 9-10. However, it is unclear if Dr. Rosen based his revised results on all corrected GADS data.

the five-year limitations period set forth in 28 U.S.C. § 2462 applies to claims 1 and 7.  See, U.S. v. LTV Steel Co., 116 F.Supp.2d 624, 632 (W.D.Pa. 2000).[57]

Under the CAA, a claim alleging a failure to obtain a preconstruction permit accrues at the time of construction or modification at the facility.  United States v. Brotech Corp., 2000 WL 1368023, * 3 (E.D.Pa., Sept. 19, 2000), citing Ogden Projects, Inc. v. New Morgan Landfill Co., 911 F.Supp. 863, 876 (E.D.Pa. 1996).  Since the plaintiffs filed their original complaint on June 28, 2005, Allegheny argues the plaintiffs are barred from seeking civil penalties for preconstruction permit violations that occurred prior to June 28, 2000.  As recited above, claims 1 and 7 pertain to Allegheny's alleged failure to comply with preconstruction permitting requirements for modifications made at its Armstrong Plant in 1994 and 1995.

In opposing summary judgment, the plaintiffs argue that the "discovery rule" applies to claims 1 and 7.  They insist they did not discover Allegheny's violations of the CAA's preconstruction permit requirements at the Armstrong Plant until 2003 at the earliest.  In arguing that the discovery rule applies to claims under the CAA, the plaintiffs rely on L.E.A.D. v. Exide Corp., 1999 WL 124473 (E.D.Pa., Feb. 19, 1999), one of the few cases to address this issue.  In L.E.A.D., the Court held that the discovery rule applied to claims under the CAA.  In so holding, the L.E.A.D. Court reasoned that policy concerns which motivated Courts to apply the discovery rule to claims under the Clean Water Act, 33 U.S.C. § 1365, as in Public Interest Research Group

---

57.  It is provided in 28 U.S.C. § 2462:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or property is found within the United States in order that proper service may be made thereon.

of New Jersey v. Powell Duffryn, 913 F.2d 64, 75 (3d Cir. 1990), similarly applied to claims under the CAA.  Id. at *4.  Other Courts deciding this issue have also ruled that the discovery rule applies to claims under the CAA.  See, United States v. Nucor Corp., 1997 U.S. Dist. LEXIS 22994, *22-23 (N.D.Ala., Nov. 4, 1997); but see, United States v. Murphy Oil USA, 143 F.Supp.2d 1054, 1085 (W.D.Wis. 2001) (limiting application of discovery rule under CAA to cases where a defendant takes affirmative acts to prevent discovery of permit violations).

We agree that the discovery rule applies to claims 1 and 7.  Under the discovery rule, "a claim will accrue when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."  Romero v. Allstate Corp., 404 F.3d 212, 222 (3d Cir. 2005).  "The discovery rule does not delay the running of the statute of limitations until a plaintiff is aware of all the facts necessary to bring its cause of action."  New Castle County v. Halliburton NUS, 111 F.3d 1116, 1125 (3d Cir. 1997).  Rather, "a claim accrues upon awareness of *actual injury*, not upon awareness that the injury constitutes a *legal wrong*."  Id. (emphasis in original).

Allegheny asserts that DEP had actual or constructive knowledge of work undertaken at Armstrong Units 1 and 2 when it occurred in 1994 and 1995, such that claims 1 and 7 are time-barred.  DEP admits it knew that Allegheny was installing low-NOx burners at the Armstrong Units in 1994 and 1995; however, it insists it lacked actual knowledge of the scope and size of the work performed there.

The plaintiffs explain as follows:

Plaintiffs filed suit on June 28, 2005, asserting that the entirety of the work conducted on the Armstrong Unit 1 boiler facility in the 1995 outage and on the Unit 2 boiler facility in the 1994 outage constituted the two 'major

modifications' that triggered PSD requirements... For each unit, the work in those outages consisted of several projects authorized under different Allegheny [original and revised] work orders, and in particular a 'boiler project' and a 'low-NOx burner conversion' for each unit...

On September 19, 2007, in response to an Allegheny interrogatory asking Plaintiffs to specify how they defined the 'modification[s]', Plaintiffs narrowed [the] PSD claims to assert that only the work reflected on the revised version of the boiler project work orders, Exs. 52, 57, constituted the two 'major modifications' that triggered PSD requirements...

The work reflected on those revised versions of the boiler project work orders included replacement and modification of the convection superheater, reheater and economizer... three components ... which Plaintiffs refer to herein as the 'Additional Work'.[58]

DEP avers that it did not have actual knowledge of the Additional Work before 2003 at the earliest.[59] According to the plaintiffs, Allegheny informed DEP it was undertaking a 32-week outage at Armstrong Units 1 and 2 to install low-NOx burners there, but Allegheny did not tell DEP it was doing the Additional Work during those outages, and DEP had no other notice Allegheny was performing the Additional Work.[60] DEP asserts it had no information suggesting that Allegheny violated the law at the Armstrong Plant until 2003, and it did not obtain documents concerning the Additional Work that would have allowed it to evaluate and raise the issues in this lawsuit until 2004.[61]

---

58. See, plaintiffs' response No. 1 to Allegheny's statement of material facts in support of its current motion.

59. Id. at No. 2.

60. Id. at No. 8.

61. Id. at No. 13. In support of its position, DEP cites a declaration from its assistant counsel,

(continued...)

Allegheny insists that in 1994 and 1995, they submitted numerous outage reports on the projects at Armstrong Units 1 and 2 to the Pennsylvania Public Utilities Commission, describing the length of the outages and the boiler rehabilitation and low-NOx burner installations conducted there. The plaintiffs point out, however, that Allegheny has not shown that DEP saw these reports, should be charged with their knowledge, or demonstrated that the plaintiffs knew, or should have known of the Additional Work based on these reports.[62] Allegheny also submitted annual emissions reports to DEP which disclosed the length of the outages for the projects and indicated that significant work had occurred at Armstrong, but Allegheny has not shown that DEP knew of the Additional Work based on its review of actual emissions data.[63]

DEP acknowledges that it certified the Armstrong Plant as in compliance with applicable federal and state laws, and it never raised issues with Allegheny about compliance with environmental laws that are the subject of this suit before or while the projects were in progress.[64] In addition, DEP did not require PSD permitting for the installation of low-NOx

_____

61. (...continued)
Robert A. Reilly, which was filed in support of plaintiffs' prior motion for a protective order to quash two deposition notices (Doc. No. 62-4). In his declaration, Mr. Reilly avers that in July 2003, attorneys for the EPA provided him with a confidential analysis regarding potential CAA claims against Allegheny at their Pennsylvania plants, and in April 2004, he obtained EPA authorization for DEP to review documents pertaining to Allegheny's Plants. Id. at ¶¶ 3, 5.

62. See, plaintiffs' responses Nos. 20 and 21 to Allegheny's statement of material facts in support of their current motion.

63. Id. at No. 23.

64. Id. at No. 11.

burners and associated boiler work at Armstrong which did not entail the Additional Work.[65]  As DEP explains, the Armstrong Plant received annual compliance inspections, during which it checked for compliance with federal and state laws concerning conditions in underlined existing permits there; however, its inspections did not involve compliance with PSD, NNSR, or other requirements for which Allegheny did not apply for a preconstruction permit or plan approval.[66]

Under PSD regulations, Allegheny -- as owner and operator of a proposed source or modification -- was required to submit to DEP "all information necessary to perform any analysis or make any determination" regarding PSD applicability.  See, 40 C.F.R. § 52.21(n).  Allegheny did not apply for a preconstruction permit or plan approval for the projects.  Since Allegheny has not shown that DEP knew, or should have known of the Additional Work at Armstrong before June 28, 2000, a material issue of fact exists as to when the plaintiffs discovered Allegheny's Additional Work which was said to trigger PSD requirements.

Further, to the extent claims 1 and 7 seek injunctive relief for Allegheny's alleged misconduct, they are not time-barred.  See, Freeman v. The Cincinnati Gas & Elec. Co., 2005 WL 2837466, * 2 (S.D.Ohio, Oct., 27, 2005) (ruling that "28 U.S.C. § 2462, by its terms, applies only to suits for civil penalties, and statutes of limitations historically do not control measures of equitable relief"); accord, United States v. Cinergy Corp., 397 F.Supp.2d 1025, 1031 (S.D. Ind. 2005) (noting that "[s]everal courts have refused to apply the statute of limitations to claims for injunctive relief in the [CAA's] enforcement suits"), citing New York v. Niagra Mohawk Power Corp., 263 F.Supp.2d 650, 663 n.22 (W.D.N.Y. 2003); United States v. Illinois Power Co., 245

---

65.  Id. at No. 19.

66.  Id. at No. 5.

F.Supp.2d 951, 958 n.3 (S.D.Ill. 2003); United States v. Westavco, 144 F.Supp.2d 439, 443, n.2 (D.Md. 2001). Thus, summary judgment on claims 1 and 7 is not appropriate.[67]

Allegheny also argues that claims 2-3, 6, 8-9 and 12 are time-barred -- insofar as they seek civil penalties -- under the seven-year limitations period in 35 Pa.C.S. § 4010.3.[68] In these claims, the plaintiffs contend that Allegheny violated the APCA and its implementing regulations when they made modifications to Units 1 and 2 at the Armstrong Plant by failing to comply with preconstruction permit requirements, by failing to apply for, or obtain plan approval and operating permits, and/or by failing to comply with emissions limitations, or meeting the lowest achievable emission rate.

---

67. Allegheny has renewed their argument that the plaintiffs' claims for injunctive relief in claims 1 and 7 should be dismissed pursuant to the concurrent remedy doctrine, citing National Parks & Conservation v. Tennessee Valley, 502 F.3d 1316 (11th Cir. 2007), cert. denied, 128 S.Ct. 2958 (2008). Under the concurrent remedy doctrine, "equity will withhold its relief in such cases where the applicable statute of limitations would bar the concurrent legal remedy." Cope v. Anderson, 331 U.S. 461, 464 (1947). This Court previously held that the concurrent remedy doctrine does not apply to claims 1 and 7, and that is the law of the case. See, our Report and Recommendation dated April 19, 2006 at p. 10, n.3 (Document No. 45), which was adopted as the opinion of the Court per Order dated May 30, 2006 (Document No. 50). "The law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation." Hamilton v. Leavy, 322 F.3d 776, 786 (3d Cir. 2003). "The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity." In Re City of Philadelphia Litigation, 158 F.3d 711, 717-18 (3d Cir. 1998). Our Court of Appeals has stated that the law of the case doctrine does not preclude reconsideration of previously decided issues in "extraordinary circumstances", such as where: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." Id. at 718. None of the above "extraordinary circumstances" applies to our prior ruling that the concurrent remedy doctrine does not bar the plaintiffs' claims for injunctive relief in claims 1 and 7; hence, we will not reconsider the issue. Having ruled that the plaintiffs' claims for civil penalties in claims 1 and 7 are not time-barred on the record before us, the concurrent remedy doctrine is inapplicable.

68. It is provided in 35 P.S. § 4010.3: "The provisions of any other statute to the contrary notwithstanding, actions for civil or criminal penalties under this act may be commenced at any time within a period of seven (7) years from the date the offense is discovered."

Under the applicable limitations period, these complained-of acts begin to run on "the date the offense is discovered." 35 Pa.C.S. § 4010.3. In the amended complaint, claim 2 alleges a 1995 modification; claim 3 alleges a 1995 modification; claim 6 alleges a 1995 modification; claim 8 alleges a 1994 modification; claim 9 alleges a 1994 modification; and claim 12 alleges a 1994 modification. According to Allegheny, since these claims were not brought within seven years of when they should have been discovered, they are time-barred.

Contrary to Allegheny's position, the plaintiffs' state law claims under the APCA are not time-barred. Regulations implementing Pennsylvania's APCA provide: "Each day of continued violation and each violation of any provision of this act... shall constitute a separate offense and violation." 35 P.S. § 4009.3. We agree with the plaintiffs that by virtue of 35 P.S. § 4009.3, each day that Allegheny may have operated the Armstrong Plant without a necessary permit, or without meeting requisite emissions standards would constitute a new violation under the APCA.[69] Since we cannot say as a matter of law that claims 1-3, 6-9, and 12 are time-barred, the defendants' motion for partial summary judgment on these claims should be denied.

Allegheny's motion for summary judgment on claims 4, 10, 15, 17, 19 and 23:

In Allegheny's second motion for summary judgment (Document No. 141), they argue that the plaintiffs cannot show in claims 4 and 10 that Allegheny's replacement of boilers at Units 1 and 2 of the Armstrong Plant (the "Armstrong Reconstruction Claims") violated NSPS standards, just as they cannot prove in claims 15, 17, 19 and 23 that Allegheny's replacement of components at Units 1, 2 and 3 of the Hatfield's Ferry Plant and Unit 3 of the Mitchell Plant

---

69. The plaintiffs aver that at a minimum, DEP may obtain civil penalties for Allegheny's alleged daily violations occurring after June 28, 1998, which was seven years before it filed suit.

violated PSD regulations. This motion should be denied.

With respect to the Armstrong Reconstruction Claims, the plaintiffs contend that Allegheny's 1995 boiler modification project at Armstrong Unit 1 (claim 4) and their 1994 boiler modification project at Armstrong Unit 2 (claim 10) constituted "reconstruction" of these units so as to subject them to NSPS requirements. According to the plaintiffs, since Allegheny completed reconstruction of these units, they have not operated them in accordance with NSPS emissions standards.

In 40 C.F.R. § 60.15(b), NSPS regulations define "reconstruction" as: "the replacement of components of an existing facility to such an extent that:

> (1) The fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable new facility, and

> (2) It is technologically and economically feasible to meet the applicable standards set forth in this part.

In 40 C.F.R. §§ 60.15(d)&(e), NSPS regulations further provide:

> (d) If an owner or operator of an existing facility proposes to replace components, and the fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable entirely new facility, he shall notify the Administrator of the proposed replacements... before construction of the replacements is commenced....

> (e) The Administrator will determine, within 30 days of the receipt of the notice required by paragraph (d) of this section and any additional information he may reasonably require, whether the proposed replacement constitutes reconstruction.

In moving for summary judgment on the Armstrong Reconstruction Claims,

Allegheny argues that the plaintiffs have failed to show -- on the basis of costs associated with construction of an entirely new facility -- that the fixed capital costs of the boiler modification projects at Units 1 and 2 exceeded 50 percent of the fixed capital costs that would be required to construct a comparable new facility (the "50% Rule"). Allegheny asserts that instead, the plaintiffs base their 50% Rule calculations on costs associated with the original installation of Armstrong Units 1 and 2 in 1958 and 1959, and as updated to determine the cost of a comparable new facility in 1994 and 1995 when the boiler modifications occurred, which is an impermissible approach to estimating reconstruction costs.

The 1995 boiler modification project at Armstrong Unit 1 involved, among other things: the demolition and complete removal of the boiler and ash hopper with the exception of the steel drum, six downcomers, and downcomer feeder tubes; the demolition and complete removal of the draft plant including steel foundation piers, flues, ducts and airheaters; and the removal of the existing boiler control system and installation of a new boiler control system.[70] The 1994 boiler project at Armstrong Unit 2 was similar to the project at Unit 1.[71]

Hugh Larkin, a utility accounting expert for the plaintiffs, reported that fixed capital costs of the new components which Allegheny installed at Armstrong Unit 1 in 1995 were $52,780,916.50, while fixed capital costs of the new components installed at Armstrong Unit 2 in 1994 were $53,302,357.70.[72] Allegheny's expert, Jerry Golden, opined that the cost of the

---

70. See, Allegheny's responses Nos. 53 and 55 to the plaintiff's response to Allegheny's current motion.

71. Id. at No. 56.

72. Id. at No. 57.

activities was $47,677,725.08 at Armstrong Unit 1 and $46,754,248.73 at Armstrong Unit 2.[73] The plaintiffs aver that the different dollar amounts derived at by the experts are immaterial for purposes of summary judgment, because even utilizing Jerry Golden's costs at Units 1 and 2, Allegheny surpassed the 50% Rule.

The plaintiffs rely on reports from their experts, Hugh Larkin and Ranajit Sahu, who utilized different approaches to ascertain that the fixed capital costs for the new components at issue exceeded 50 percent of the fixed capital cost that would be required to construct a comparable new facility at Units 1 and 2.[74] Citing to their experts' reports, the plaintiffs explain that Mr. Larkin and Mr. Sahu based their findings on the following four approaches:

> (1) Mr. Larkin used the original basis of the Armstrong units, adjusted to reflect capital improvements at the units. See Ex. 44 at 49-51 (relying on the 1989 EPA memorandum found at DX 98);
>
> (2) Mr. Larkin also escalated the original basis of each Armstrong Unit to 1993 and 1994/1995 dollars. Ex. 45.
>
> (3) Mr. Sahu extrapolated (using a method identified by Allegheny's proffered expert, Jerry Golden) from cost estimates for construction of a 300 MW coal-fired power plant that are contained in a 1993 report prepared by the Electric Research Power Institute. Ex. 47 at 8-10 & Table 1.
>
> (4) Mr. Sahu extrapolated (again using Mr. Golden's methodology) from cost estimates for construction of a new 397.5 MW coal-fired power plant that are contained in a 1998 U.S. Department of Energy

---

73. Id.

74. See, plaintiffs' Exhibit 44 at pp. 49-51, and Exhibit 45 (which are Hugh Larkin's reports dated September 17, 2007 and October 31, 2007 respectively); also see, plaintiffs' Exhibit 47 at pp. 8-10 (which is Ranajit Sahu's October 2007 report).

report.  Ex. 47 at 8-10 & Table 2.[75]

Allegheny takes umbrage with Mr. Larkin's reconstruction calculations.  As discussed above, Allegheny argues that Mr. Larkin and the plaintiffs improperly base their Armstrong Reconstruction Claims not on the cost of an entirely new facility at Armstrong Units 1 and 2 in 1994 and 1995, but on the original installed cost of those units in 1958 and 1959, and as updated to reflect 1993-1995 costs, which is contrary to EPA practice.

In response, the plaintiffs assert that EPA has endorsed a variety of approaches for estimating reconstruction costs[76], and nowhere has EPA proffered guidance which precludes Mr. Larkin's aforesaid calculation approaches.[77]  The plaintiffs also point out that Mr. Sahu's October 2007 report is based on different approaches to estimating reconstruction costs and utilizes documents and data relied on by Allegheny's expert, Mr. Golden.  The plaintiffs aver that under all of the approaches utilized by their experts, Allegheny exceeded the 50% Rule, even using Allegheny's figures for the cost of the components.  Based on the reports of Mr. Larkin and Mr. Sahu, summary judgment is not appropriate on claims 4 and 10.[78]

---

75.  See, plaintiffs' memorandum of law opposing the current motion at p. 7.

76.  See, plaintiffs' Exhibit 85 and Allegheny's Exhibits 101-105.

77.  In support of Mr. Larkin's approaches, the plaintiffs cite a 1989 EPA memorandum pertaining to NSPS modification requirements -- not the reconstruction provision -- which provides: "it is more appropriate to utilize the original basis of each affected facility (as adjusted to reflect past capital improvements), expressed in nominal dollars, rather than the updated basis, expressed in current dollars, in determining NSPS applicability."  See, Allegheny's Exhibit 98 at p. 4.

78.  Allegheny also argues with respect to claims 4 and 10 that the EPA Administrator did not render a determination under 40 C.F.R. §§ 60.15(e)-(f) that the projects at Armstrong Units 1 and 2 were "reconstructions".  The regulations make clear, however, that before the Administrator

(continued...)

In claims 15, 17, 19 and 23, the plaintiffs complain that Allegheny made modifications to Units 1, 2 and 3 at their Hatfield's Ferry Plant (claims 15, 17 and 19 respectively) and to Unit 3 at their Mitchell Plant (claim 23) which triggered federal PSD requirements, but that Allegheny did not apply for, or obtain a PSD permit for the modifications. Allegheny moves for summary judgment on these claims, arguing that: (1) their projects at these units were RMRR and thus excluded from PSD permitting requirements; and (2) the projects did not result in significant net emissions increases.

As discussed above, pertinent PSD regulations apply to "any major modification" at a "major stationary source". See, 40 C.F.R. § 52.21(i)(2). A "major modification" means "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i).

Excluded from PSD regulations, however, is routine maintenance, repair and replacement ("RMRR"). 40 C.F.R. § 52.21(b)(2)(iii)(a). To determine if Allegheny's projects at issue fall within the RMRR exclusion, we analyze their nature and extent, purpose, frequency and cost with reference to whether they were routine to the industry as a whole. See, WEPCO, 893 F.2d at 911-912; East Kentucky Power Cooperative, 498 F.Supp.2d at 993-994, Alabama Power Co., 372 F.Supp.2d at 1307, and Duke I, 278 F.Supp.2d at 638. For reasons discussed

---

78. (...continued)
makes any such determination, he must receive notice from an owner or operator of an existing facility (such as Allegheny) of their proposed replacement of components "before construction of the replacements is commenced". 40 C.F.R. §§ 60.15(d)(e). Allegheny failed to provide such notice to the Administrator.

below, Allegheny has not shown that the projects at issue were RMRR.

In claim 15, the plaintiffs allege that in 1997, Allegheny modified Unit 1 of the Hatfield's Ferry Plant when they replaced the secondary superheater outlet headers and all of the lower slope panels. The plaintiffs assert that Allegheny should have projected that these projects would result in a significant net emission increases of $SO_2$ and $NO_x$.

With respect to the secondary superheater outlet header project at Unit 1, the record shows that Allegheny began planning the project over two years before it was performed; that the project involved replacing both secondary superheater outlet headers with newly fabricated outlet headers that were of an upgraded design and a stronger material than the original outlet headers; that the work associated with the project took more than 2.5 months; and that it was performed by outside contractors using materials fabricated by outside contractors.[79] The existing outlet headers at Unit 1 had never been replaced prior to the project.[80] The purpose of this project was to reduce forced outages caused by the secondary superheater outlet header.[81] The cost of the project exceeded $2.2 million dollars, and Allegheny treated the cost as a capital expenditure, not a maintenance expense.[82]

As to the lower slope project at Unit 1, Allegheny began planning it more than two years before it was performed, and work on the project ensued during an approximate 10

---

79.   See, Allegheny's responses Nos. 16-18 to plaintiffs' statement of facts relevant to the current motion.

80.   Id. at No. 21.

81.   Id. at No. 19.

82.   Id. at No. 20.

week outage.[83]   This project involved completely replacing the lower slope tubes, seal skirt and

ash hopper, so as to allow for design improvements such as thicker tubes, redesigned materials

and configuration of the furnace seals to improve their longevity.[84]   Allegheny had not previously

performed such extensive work on the lower slope panels and ash hopper at Unit 1.[85]   Work on

the project was performed by outside contractors using materials fabricated by outside

contractors.[86]   The purpose of this project was to reduce forced outages caused by the lower slope

panels.[87]   The cost of the project exceeded $4.9 million, and Allegheny treated the cost as a

capital expenditure, not a maintenance expense.[88]

    Based on these facts, the "nature and extent" of these projects were not RMRR.

Jerry Golden, Allegheny's expert, believes that these projects were "consistent with the nature of

other maintenance repair and replacement activities performed elsewhere on the Allegheny

system and at other electric utilities throughout the country"[89]; however, Mr. Golden has not

shown that the scope of these projects were routine.  Rather, in cases as here, where projects

involve extensive replacements, design upgrades, use of improved materials, a new

configuration, are performed by outside contractors, and take months to complete, Courts hold

---

83. Id. at No. 22.

84. Id. at No. 23.

85. Id. at No. 27.

86. Id. at No. 24.

87. Id. at No. 25.

88. Id. at No. 26.

89. See, Allegheny's Exhibit 51 at pp. 51 and 61.

they are not RMRR.  See, Cinergy Corp., 495 F.Supp.2d at 943-44; Sierra Club, 2007 WL 3287850, *14.  Mr. Golden's averments that the projects were "[p]erformed by skilled craftsmen managed by a reputable contractor working under a target cost contract... [which] was one of [over 20] labor contracts executed by [myriad] external organizations during the subject outage[s]"[90] does not evince RMRR.

Jerry Golden avers that the "purpose" of these projects was "to avoid future forced or maintenance outages and reduce maintenance costs", which "are totally consistent with the fundamental purpose of all maintenance, repair and replacement activities at a generating unit."[91] Some Courts have ruled that if a project's purpose is to minimize leaks and forced outages, save money by limiting future repairs and maintenance, or improve a unit's availability and reliability, it supports a finding that the work is not routine.  Cinergy Corp., 495 F.Supp.2d at 938, 941; Sierra Club, 2007 WL 3287850 at *13; Ohio Edison, 276 F.Supp.2d at 860-61.  However, such a determination must be made on a case by case basis, WEPCO, 893 F.2d at 910; and based on the record before us, we cannot say that the purpose of these projects were inconsistent with RMRR.

As to the frequency of these projects, the record shows that the outlet headers at Unit 1 had never before been replaced, and Allegheny had not previously performed such extensive work on the lower slope panels and ash hopper there.[92]  Jerry Golden opines, however, that header replacement activity within the industrial sector is "quite common", as is waterwall

90.   Id. at pp. 54 and 63.

91.   Id. at pp. 52 and 62.

92.   See, Allegheny's responses Nos. 21 and 27 to the plaintiffs' statement of facts relevant to the current motion.

replacement activity.[93]  Mr. Golden reports that based on a summary of projects undertaken by 147 separate generating units which the plaintiffs allege violated NSR, 26 projects were performed which involved the replacement of headers[94], and 16 projects were performed which involved the replacement of lower waterwall or slope tubing.[95]  Significantly however, no evidence shows whether the scope of such projects were comparable to those at issue here.  As such, Allegheny has not shown that the frequency of such projects evinces RMRR.

Insofar as the cost of these projects at Unit 1, the record shows that the secondary superheater outlet header project cost in excess of $2.2 million; that the lower slope panel replacement project cost more than $4.9 million; and that Allegheny treated these costs as capital expenditures, not maintenance costs.[96]  Jerry Golden avers that the secondary superheater outlet header project was performed at a cost of approximately $5/kW, or about 1.5% of the cost of the WEPCO Port Washington project (which cost about $323/kW), and from 2% to 3% of the cost of the Beckjord Units 1 and 3 life extension projects.[97]  The slope replacement project was performed at a cost of approximately $11/kW, or about 3.5% of the cost of the WEPCO Port Washington project, and from 4.3% to 6.2% of the cost of the Beckjord Units 1 and 3 life

_____

93.   See, Allegheny's Exhibit 51 at pp. 53 and 62.

94.   Id. at p. 62.

95.   Id. at p. 53.

96.   See, Allegheny's responses Nos. 20 and 26 to the plaintiffs' statement of facts relevant to the current motion.

97.   See, Allegheny's Exhibit 51 at p. 63.

extension projects.[98]

Based on these facts, we cannot say as a matter of law that the cost of the projects supports a finding of RMRR. As discussed above, Courts hold that when a project is relatively expensive and treated as a capital expenditure rather than a maintenance cost, it weighs against a finding of RMRR. Cinergy Corp., 495 F.Supp.2d at 939; Sierra Club, 2007 WL 3287850, at *17.

In support of their assertion that the projects at issue were RMRR, Allegheny cites the deposition testimony of several DEP officials who believed that under PSD regulations, the projects were RMRR.[99] The plaintiffs assert, however, that most of the fact witnesses on whom Allegheny relies had no responsibility for interpreting or applying PSD permitting requirements.[100] Certainly, "an isolated opinion of an agency official does not authorize a court to read a regulation inconsistently with its language." Environmental Defense v. Duke Energy Corp., 127 S.Ct. 1423, 1436 (2007). Tellingly, Allegheny has not cited one case in which a court has found that projects such as those at issue here are RMRR. Based on the facts and case law recited above, genuine issues of material fact exist as to whether the projects (and those involved in claims 17, 19 and 23) were RMRR.

For instance, in claim 17, the plaintiffs complain that Allegheny modified Unit 2 of the Hatfield's Ferry Plant in 1993, when they replaced the pendant reheater bank and connecting crossover tubes (the "1993 project"), and in 1999, when they replaced the lower slope

---

98.　Id. at p. 54.

99.　See, Allegheny's brief in support of their current motion at pp. 9-11.

100.　See, plaintiffs' brief opposing the current motion at pp. 11-12.

panels (the aforementioned "Project").  The plaintiffs assert that Allegheny should have projected these projects would result in significant net emission increases of SO2 and NOx.[101]

We have already found -- in determining the plaintiffs' motion for summary judgment -- that Allegheny did not prove as a matter of law that the Project at Hatfield's Ferry Unit 2 was RMRR.  We make a similar finding as to the 1993 project there.

Allegheny began planning the 1993 project at least 18 months before the outage at which it was performed.[102]  The project entailed removing the existing reheater assemblies and crossover tubes and replacing them with newly fabricated assemblies made of a different material that Allegheny anticipated would be more resistant to corrosion than the existing assemblies.[103]  The work associated with the project took approximately 9 weeks and was performed by outside contractors, not Allegheny's own maintenance employees.[104]  The purpose of the project was to reduce forced outages caused by the pendant reheater[105], and to "optimize the future availability and reliability of the boiler".[106]  Although Allegheny had previously replaced some of the crossover tubes, they had never previously replaced the entire pendant reheater or all of the

---

101.    In claim 17, the plaintiffs also alleged that Allegheny's secondary superheater outlet header replacement project in 1999 violated PSD permitting requirements.  However, in a letter to Allegheny's counsel dated January 11, 2008, the plaintiffs agreed to dismiss that claim.  See, Allegheny's Exhibit 58.

102.    See, Allegheny's response No. 4 to the plaintiffs' statement of facts relevant to the current motion.

103.    Id. at No. 5.

104.    Id. at No. 8.

105.    Id. at No. 6.

106.    See, plaintiffs' Exhibit 114 at AE_HQ_017985.

crossover tubes.[107]  The project cost more than \$4.7 million, and Allegheny treated that cost as a capital expenditure, not a maintenance expense.[108]

Based on these facts, we cannot say that the nature and extent of the 1993 project, the frequency of such a replacement, and its cost were RMRR.  Jerry Golden asserts that the 1993 project was "consistent with the nature of other maintenance repair and replacement activities performed elsewhere on the Allegheny system and at other electric utilities throughout the country."[109]  He also avers that replacement of waterwall tubing is common within the industrial sector, and based on a summary of projects undertaken by 147 generating units which the plaintiffs allege violated NSR, 82 projects were performed which involved replacement of all or significant portions of reheaters.[110]  No evidence shows, however, if the scope of these other projects were comparable to the 1993 project.  Certainly, Allegheny never previously replaced the entire pendant reheater or all of the crossover tubes prior to performing the 1993 project.

As to the cost of the 1993 project, Mr. Golden reports it was performed at a cost of approximately \$10/kW, or about 3% of the cost of the WEPCO Port Washington project and about 4% to 5.5% of the cost of the Cincinnati Beckjord Units 1 and 3 life extension projects.[111]  As mentioned above, however, the cost of this project exceeded \$4.7 million, and Allegheny treated that cost as a capital expenditure, not a maintenance expense.

--------

107.  See, Allegheny's response No. 9 to the plaintiffs' statement of facts relevant to the current motion.

108.  Id. at No. 7.

109.  See, Allegheny's Exhibit 51 at p. 70.

110.  Id. at p. 71.

111.  Id. at p. 73.

Courts hold that when a project is large in scope, takes months to complete, involves the installation of newly-fabricated assemblies which constitute an upgraded or improved design, is performed by outside contractors, has not been frequently undertaken, is relatively expensive and is treated as a capital expenditure rather than a maintenance expense -- as is the 1993 project -- it is not RMRR. See, WEPCO, 893 F.2d at 911-13; Cinergy Corp., 495 F.Supp.2d at 939, 943-44; Sierra Club, 2007 WL 3287850, *13-17.

Similarly, Allegheny's replacement of the lower slope tube panels and seal skirt at Hatfield's Ferry Unit 3 in 1996 (the "1996 project") -- which is the subject of claim 19 -- does not evince RMRR. Allegheny began planning the 1996 project more than one year before it was performed during the course of a 9 week outage.[112] The project involved the wholesale replacement of the lower slope tube panels and replacement of the seal skirt with an improved design.[113] The purpose of the project was to reduce forced outages caused by Unit 3's lower slope panels.[114] The work was performed by an outside contractor using materials fabricated by a different outside contractor.[115] The 1996 project cost more than $5.1 million, and Allegheny treated that cost as a capital expenditure, not a maintenance cost.[116] Allegheny had not previously replaced the lower slope tube panels at Hatfield's Ferry Unit 3 to such an extensive

---

112.    See, Allegheny's response No. 10 to the plaintiffs' statement of facts relevant to the current motion.

113.    Id. at No. 11.

114.    Id. at No. 13.

115.    Id. at No. 12.

116.    Id. at No. 14.

degree.[117]

Jerry Golden avers that the 1996 project was consistent with the nature of other activities performed at Allegheny Plants and at other electric utilities throughout the country; that the replacement of sections of lower slope tubing is performed frequently in the industry; and that the project cost about $12/kW, or less than 4% of the cost of the WEPCO Port Washington project and from 5% to 7% of the cost of the Cincinnati Beckjord projects at Units 1 and 3.[118] As with our prior determinations, however, there is not sufficient evidence showing the extent of these other projects mentioned in Mr. Golden's report. Based on the facts recited above, and the case law on RMRR previously discussed, Allegheny has not met their burden of demonstrating that the 1996 project was routine.

In claim 23, the plaintiffs allege that Allegheny modified Unit 3 of the Mitchell Plant in 1994, when they replaced 24 front and rear ash hopper partial lower slope tube panels (the "Mitchell project"). According to the plaintiffs, Allegheny should have projected the Mitchell project would result in a net emissions increase of more than 40 tons per year of NOx.[119]

The Mitchell project involved the replacement of 24 front and rear partial lower slope furnace panels, which included portions of 556 tubes.[120] Allegheny had never before

---

117.   Id. at No. 15.

118.   See, Allegheny's Exhibit 51 at pp. 85-88.

119.   In claim 23, the plaintiffs also alleged that Allegheny should have projected that a significant net emissions increase of SO2 would result by virtue of the Mitchell project. However, in a letter to Allegheny's counsel dated January 11, 2008, the plaintiffs agreed to withdraw that contention. See, Allegheny's Exhibit 58.

120.   See, Allegheny's response No. 42 to the plaintiffs' statement of facts relevant to the current motion.

performed such an extensive lower slope tube panel project at Mitchell.[121]  The purpose of the

project was to reduce forced outages caused by the lower slope panels[122] and improve Unit 3's

availability.[123]  The project cost at least $525,000, and Allegheny treated that cost as a capital

expenditure, not a maintenance expense.[124]  Work on the Mitchell project was performed by

outside contractors during an outage.[125]

Jerry Golden reports that the Mitchell project took eight weeks to complete.[126]  He

also asserts the project was consistent with the nature of other maintenance repair and

replacement activities performed at Allegheny Plants and other electric utilities throughout the

country.[127]  Mr. Golden opines that similar projects have occurred frequently throughout

Allegheny's system and the rest of the utility industry, and that the Mitchell project cost less than

$2.50/kW, or less than .08% of the cost of the WEPCO Port Washington project and from .09%

to 1.3% of the cost of the Beckjord projects at Units 1 and 3.[128]

Allegheny has not shown that the Mitchell project was RMRR.  As previously

mentioned, when a project is large in scope, takes months to complete, is performed by outside

---

121.    Id. at No. 46.

122.    Id. at No. 43.

123.    See, plaintiffs' Exhibit 124 at R-3 06898.

124.    See, Allegheny's Response No. 44 to the plaintiffs' statement of facts relevant to the current motion.

125.    Id. at No. 45.

126.    See, Allegheny's Exhibit 51 at p. 43.

127.    Id.

128.    Id. at pp. 44-45.

contractors, costs in excess of $525,000 and is treated as a capital expenditure rather than a maintenance expense, as here, Courts hold it is not RMRR.  See, <u>Cinergy Corp.</u>, 495 F.Supp.2d at 939-44; <u>Sierra Club</u>, 2007 WL 3287850, *14-15.

   In the alternative, Allegheny insists they are entitled to summary judgment on the following two claims: (1) the plaintiffs' NOx PSD claim for the 1993 project at Hatfield's Ferry Unit 2 which makes up part of claim 17; and (2) the plaintiffs' PSD claim for the Mitchell project at Mitchell Unit 3 which encompasses claim 23.  As to these claims, Allegheny argues that the plaintiffs cannot show they violated PSD requirements, as no significant net emissions increase in NOx were projected for these projects.

   PSD preconstruction requirements provide that: "No major emitting facility on which construction [or modification] is commenced after August 7, 1977, may be constructed... unless -- (1) a permit has been issued for such proposed facility in accordance with this part..." 42 U.S.C. § 7475(a)(1).  As discussed above, Allegheny did not apply for or obtain a PSD permit before implementing the projects at issue.  However, pertinent PSD regulations require a permit for a modification "only when it is a major one and only when it would increase the actual annual emission of a pollutant above the actual average for the two prior years."  <u>Environmental Defense</u>, 127 S.Ct. at 1430.

   A "major modification" means "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any [regulated] pollutant".  40 C.F.R. § 52.21(b)(2)(i).  A "significant" net emissions increase means, with respect to $SO_2$ and NOx, a net emissions increase of 40 tons per year or greater, or the potential to emit those pollutants at said rates.  See, 40 C.F.R. § 52.21(b)(23)(i).

In support of summary judgment on the above two claims, Allegheny asserts that the plaintiffs' expert, Dr. Rosen, testified that based on his reports and final calculations -- set forth in Table 4 of his October 31, 2007 rebuttal report -- the 1993 project at Hatfield's Ferry Unit 2 did not cause a significant net emissions increase in NOx.[129]  Indeed, pursuant to Dr. Rosen's aforesaid method for calculating "actual-to-projected-future-actual" emissions, he projected a NOx increase of 33 tons per year for the 1993 project at Hatfield's Ferry Unit 2.[130]

Dr. Rosen also testified that based on his calculations set forth in Table 4 of his rebuttal report, it was his opinion that the Mitchell project at Mitchell Unit 3 did not cause a significant net emissions increase in either SO2 or NOx.[131]  With respect to the Mitchell project, Dr. Rosen projected a NOx increase of 39 tons per year and a SO2 increase of 11 tons per year.[132]

Significantly, Dr. Rosen testified that his aforesaid calculations for the 1993 project and the Mitchell project set forth in Table 4 of his rebuttal report were his "final results".[133]  Based on his final results and calculations, Dr. Rosen asserted that he did not know why the plaintiffs' NOx PSD claim for the 1993 project and PSD claim for the Mitchell project

───────────────

129.    See, Allegheny's Exhibit 59 (Dr. Rosen's deposition dated Dec. 20, 2007) at pp. 24-28.

130.    Id. at pp. 25-28.  Also see, plaintiffs' Exhibit 40 (which is Dr. Rosen's expert report dated September 17, 2007) at p. 29 (Table 2), and plaintiffs' Exhibit 41 (which is Dr. Rosen's rebuttal report dated October 31, 2007) at p. 10 (Table 4).  Table 4 is a revision of Table 2.

131.    See, Allegheny's Exhibit 59 at pp. 24-28.   As previously mentioned, in a letter to Allegheny's counsel dated January 11, 2008, the plaintiffs agreed to withdraw their SO2 PSD claim for the Mitchell project in claim 23.  See, Allegheny's Exhibit 58.

132.    See, plaintiffs' Exhibit 40 at p. 29 (Table 2) and plaintiffs' Exhibit 41 at p. 10 (Table 4).

133.    See, Allegheny's Exhibit 59 at pp. 24-25, 27-28.

were included in this suit, as no claims for emissions increases could be made for them.[134]

In opposing summary judgment on these claims, the plaintiffs assert that Dr. Rosen did calculate significant net NOx emissions increases for both the 1993 project and the Mitchell project, citing to Table 5 of Dr. Rosen's October 31, 2007 rebuttal report; indeed, Table 5 projects NOx increases of 82 tons per year and 57 tons per year respectively for the projects.[135] Dr. Rosen explains in his rebuttal report that his projection forecasts in Table 5 represent alternative calculations which are based on emissions levels for NOx <u>before</u> the installation of low NOx burners at the units.[136]

In contrast, Dr. Rosen's calculations in Table 4 of his rebuttal report include the impact of low NOx burners installed during the projects.[137]  At his deposition, Dr. Rosen testified that his final opinion and results were reflected in Table 4, where he projected no significant net NOx emissions increases for the 1993 project and the Mitchell project.[138]

Following his deposition, Dr. Rosen submitted errata sheets which clarify portions of his testimony.[139]  Federal Rule of Civil Procedure 30(e) permits a deponent to make changes to a transcript for 30 days after being notified that the transcript is available, and to make changes in

---

134.  Id. at pp. 26-27.

135.  See, plaintiffs' Exhibit 41 at p. 11.

136.  Id. at p. 10.

137.  Id.

138.  See, Allegheny's Exhibit 59 at pp. 24-28.

139.  See, plaintiffs' Exhibit 92.

form or substance, if he signs a statement listing the changes and the reasons for making them.[140]

Dr. Rosen made several changes to his deposition transcript to clarify his testimony. For instance, as to his testimony that his calculations in Table 4 (where he projected no significant net NOx emissions increases for the 1993 project and the Mitchell project) were his final opinion and results, Dr. Rosen clarifies they were his final opinion and results for a "low NOx to low NOx comparison".[141] In addition, Dr. Rosen clarifies that insofar as he testified that no PSD claims for emissions increases could be made as to the Mitchell project (for SO2 and NOx) and for the 1993 project (for NOx), it was in regard to his "SO2 and low NOx to low NOx comparisons"[142], which are set forth in Table 4. Conversely, Dr. Rosen's calculations in Table 5 (which reflect significant net NOx emissions increases for the 1993 project and the Mitchell project) involve a "high NOx to high NOx comparison".[143]

Allegheny urges the Court to disregard Dr. Rosen's errata sheets pursuant to the "sham affidavit doctrine", arguing that his errata sheets alter his deposition testimony and were submitted solely to create a factual dispute as to whether the 1993 project and Mitchell project triggered PSD requirements. Several Courts have evaluated Rule 30(e) corrections under the sham affidavit doctrine. See, <u>Hambleton Bros. Lumber Co. v. Balkin Enterprises</u>, 397 F.3d

---

140. As gleaned from plaintiffs' Exhibit 92, Dr. Rosen complied with Rule 30(e)'s procedural requirements, for on January 8, 2008, notice was given that the transcript was available, and on February 6, 2008, Dr. Rosen signed errata sheets listing the changes to the transcript and his reasons for making them.

141. See, plaintiffs' Exhibit 92.

142. Id.

143. See, plaintiffs' Exhibit 80 at p. 20 and plaintiffs' Exhibit 41 at p. 11.

1217, 1224-26 (9th Cir. 2005); <u>Burns v. Bd. of County Comm'rs</u>, 330 F.3d 1275, 1281-82 (10th Cir. 2003); <u>Thorn v. Sundstrand Aerospace Corp.</u>, 207 F.3d 383, 389 (7th Cir. 2000).

             Under the "sham affidavit doctrine", a Court may disregard an offsetting affidavit that is submitted in opposition to a motion for summary judgment if it contradicts the affiant's prior deposition testimony without explaining the contradiction. <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004). Stated differently, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." <u>Jiminez v. All American Rathskeller, Inc.</u>, 503 F.3d 247, 251 (3d Cir. 2007).

         A Court is not required to disregard an affidavit in all cases merely because there is a discrepancy between it and a deponent's prior testimony. <u>Baer</u>, 392 F.3d at 624. As explained by the Court in <u>Jiminez</u>, <u>supra</u>, if an affiant offers "a satisfactory explanation for the conflict between the prior deposition and the affidavit", or "when there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." <u>Id.</u> at 254.

         We do not believe Dr. Rosen's Rule 30(e) errata sheets should be disregarded under the sham affidavit doctrine. Rather than create inconsistencies in the record, Dr. Rosen's errata sheets clarify portions of his deposition testimony. For instance, with respect to his testimony that his calculations in Table 4 of his rebuttal report were his final opinions and results, Dr. Rosen does not refute such testimony in his errata sheets; instead, he clarifies that they were his final opinion and results for a "low NOx to low NOx comparison". Certainly, there is independent evidence in the record -- set forth in Table 5 of Dr. Rosen's rebuttal report (which

involves a "high NOx to high NOx comparison") -- which supports several of Dr. Rosen's Rule 30(e) clarifications mentioned above.

Based on Dr. Rosen's calculations in Table 5 of his rebuttal report and his Rule 30(e) corrections discussed above, summary judgment is not appropriate on the NOx PSD claims for the 1993 project and the Mitchell project.

Therefore, it is recommended that the plaintiffs' motion for summary judgment on claims 17 and 18 of the amended complaint (Document No. 132) be denied, that the defendants' motion for partial summary judgment on claims 1-3, 6-9, and 12 of the amended complaint (Document No. 135) be denied, and that the defendants' motion for summary judgment on claims 4, 10, 15, 17, 19 and 23 of the amended complaint (Document No. 141) be denied.

Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/ ROBERT C. MITCHELL
United States Magistrate Judge

Dated: September 2, 2008