# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ) <br> DEPARTMENT OF ENVIRONMENTAL ) <br> PROTECTION, STATE OF CONNECTICUT, ) <br> STATE OF MARYLAND, STATE OF ) <br> NEW JERSEY, and STATE OF NEW YORK, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ALLEGHENY ENERGY, INC., ) <br> ALLEGHENY ENERGY SERVICE ) <br> CORPORATION, ALLEGHENY ENERGY ) <br> SUPPLY COMPANY, LLC; ) <br> MONONGAHELA POWER COMPANY, ) <br> THE POTOMAC EDISON COMPANY, and ) <br> WEST PENN POWER COMPANY, ) <br> ) <br> Defendants. ) | 02: 05cv885 |

## MEMORANDUM ORDER

Presently before the Court for disposition are DEFENDANTS' RULE 72(B) OBJECTIONS TO THE SEPTEMBER 2, 2008 REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (Document No. 223) and PLAINTIFFS' RULE 72(B) OBJECTIONS TO MAGISTRATE JUDGE MITCHELL'S REPORT & RECOMMENDATION CONCERNING THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT (Document No. 224). Each side has filed a response (Document Nos. 225, 226), followed by an extensive oral argument on November 6, 2008 and the Objections are ripe for disposition. This Memorandum Order is intended to resolve the pending Objections to the Report and Recommendation ("R&R") of the Magistrate Judge and to outline the legal tests that will be utilized to resolve the issues which remain for trial.

**Standard of Review**

The Federal Magistrates Act provides that this Court must conduct a de novo review of a magistrate judge's decision on a dispositive matter, such as a motion for summary judgment. 28 U.S.C. § 636; Fed. R. Civ. P. 72(b).

**Discussion**

In this case, Plaintiffs ("States") are suing the owners and operators of coal-fired power plants (collectively, "Allegheny") under the federal Clean Air Act and the Pennsylvania Air Pollution Control Act. In essence, the States contend that Allegheny wrongfully failed to obtain construction permits prior to performing various construction-type projects at its Armstrong, Hatfield's Ferry and Mitchell power plants. The Clean Air Act resulted from a legislative struggle "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs." *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 847 (1984). As one compromise, the Clean Air Act has less stringent regulations regarding existing power plants as compared to newly constructed sources of electricity (i.e., they are "grandfathered") in recognition of the expense of retrofitting pollution-control equipment. *United States v. Cynergy Corp.*, 458 F.3d 705, 709 (6th Cir. 2006). However, utilities are not entitled to evade the Clean Air Act requirements by keeping the grandfathered power plants in operation indefinitely. The implementing regulations provide guidance for determining when the construction-type work performed at an existing power plant is so extensive that the more stringent

pollution-control requirements in the act are triggered. The parties have significant disagreement as to how the implementing regulations should be interpreted and applied.

The Motions At Issue

Plaintiffs filed a motion for summary judgment (Doc. No. 132) on a portion of Claims 17 and 18 of their Amended Complaint. Specifically, Plaintiffs contend that Allegheny's 1999 replacement of the lower slope panels and associated items at its Hatfield's Ferry Unit 2 (the "1999 Hatfield Project") constituted a "major modification" for which Allegheny was required to have obtained a permit.[1]

Defendants filed a motion for partial summary judgment (Doc. No. 135) on Claims 1-3, 6-9, and 12 of the Amended Complaint, on the theory that they are time-barred by the applicable statute of limitations. Claims 1 and 7 involve federal law, and Claims 2, 3, 6, 8, 9 and 12 are based on Pennsylvania state law.

Defendants also filed a separate motion for summary judgment (Doc. No. 141) as to Claims 4, 10, 15, 17, 19 and 23 of the Amended Complaint on the basis that the work performed during those projects did not trigger the permit obligation. Specifically, Defendants argue that the replacement of boilers at Units 1 and 2 of the Armstrong Plant did not violate the "50% Rule," and that Allegheny was not required to obtain a permit for the replacement of components at Units 1, 2 and 3 of the Hatfield's Ferry Plant or at Unit 3 of the Mitchell Plant because that work: (1) was

---

[1] Claims 17 and 18 also allege violations resulting from other work projects performed in 1993 and in 1999. Defendants have also moved for summary judgment as to Claim 17, but their motion appears to focus on the 1993 project.

3

routine maintenance, repair and replacement ("RMRR") and/or (2) did not result in a significant net increase in pollutant emissions.

The Pending Objections

In the September 2, 2008 R&R, Magistrate Judge Mitchell conducted an extensive, 57-page analysis of the parties' arguments. The R&R concluded that all of the motions for summary judgment should be denied, and therefore, all issues are reserved for trial. The instant Objections are directed at a limited number of specific portions of the R&R.

Plaintiffs object to: (1) the adoption of the "routine in the industry" standard for evaluating whether the 1999 Hatfield Project constituted RMRR,[2] and (2) the conclusion that genuine issues of material fact exist as to whether Defendants should have projected a significant net increase of annual emissions as a result of the 1999 Hatfield Project. Defendants object to: (1) the alleged misapplication of the "routine in the industry" test; and (2) the adoption of the "discovery rule" for tolling the federal statute of limitations.[3] The Court now turns to the parties' specific Objections, in reverse order.

---

[2]In addition, Plaintiffs have seized on the statement at page 21 of the R&R that "the RMRR exclusion does not apply" to the Hatfield's Ferry Unit 2 Project to argue that this issue has already been decided in their favor. However, in context, it is clear that the Magistrate Judge merely concluded that Defendants had not met their burden to prove that the Project fell within the RMRR exclusion *as a matter of law*. See R&R at 46-47 (genuine issues of material fact exist as to whether the projects were RMRR).

[3]While Defendants contend that summary judgment should be granted on Claims 1-3, 6-9 and 12, their argument regarding the discovery rule applies only to the portion of the R&R regarding the federal limitations period at issue in Claims 1 and 7. Defendants have not objected to the conclusion of the Magistrate Judge, R&R at 35-36, that the Pennsylvania law claims are not time-barred.

Legal Analysis

      1.      Statute of Limitations/Discovery Rule

Defendants first argue that the Magistrate Judge's R&R dated April 19, 2006, which was adopted by this Court on May 30, 2006, constitutes the "law of the case." Defendants argue that the Court has already ruled that the limitations period will be tolled only where a defendant makes "affirmative efforts" to prevent plaintiff from discovering the violation. The Court cannot agree. Magistrate Judge Mitchell did review the cases cited by each side, *L.E.A.D. v. Exide Corp.*, 1999 WL 124473 (E.D. Pa. 1999) (cited by Plaintiffs) and *United States v. Murphy Oil USA*, 143 F. Supp.2d 1054, 1084-85 (W.D. Wis. 2001) (criticizing the rationale in *L.E.A.D.*) and he did quote from *Murphy Oil*. April 19, 2006 R&R at 7-9. However, the Magistrate Judge did not resolve the conflict between *L.E.A.D.* and *Murphy Oil*. Instead, the R&R simply concluded: "we cannot say at this juncture when the plaintiffs had notice of Allegheny's alleged permit violations. This presents a factual question that should not be resolved on a motion to dismiss." April 19, 2006 R&R at 9. Thus, this Court's adoption of the April 19, 2006 R&R did not establish "law of the case" with respect to the discovery rule.[4]

The Court turns now to the substance of Defendants' contention that Claims 1 and 7 are untimely as a matter of law.[5] At oral argument, defense counsel represented that this argument related only to the work performed on the Armstrong Units 1 and 2 Projects in 1994 and 1995. It is

---

[4]The April 19, 2006 R&R further concluded that the claims were not time-barred to the extent they sought injunctive relief. This aspect of the R&R has not been challenged. *See also* September 2, 2008 R&R at 34.

[5]Defendants do not object to the Magistrate Judge's conclusion, September 2, 2008 R&R at 35-36, that the claims under Pennsylvania law are not time-barred.

5

undisputed that because the Clean Air Act contains no specific statute of limitations, the default five-year limitations period set forth in 28 USC § 2462 applies. This case was filed in 2005, and therefore, the federal claims for civil penalties resulting from work performed in the mid-1990s are time-barred unless the statute of limitations can be tolled. Plaintiffs contend that a broad discovery rule should apply, such that the limitations period does not begin to run "until the plaintiff discovers or should have discovered the violation." *L.E.A.D.* at *4. Defendants contend that no tolling should be permitted or, alternatively, that the limitations period should be tolled only under the more narrow "affirmative efforts to prevent discovery" standard.

It is important to recognize that this statutory interpretation issue does not involve environmental law, but instead, requires construction of the default limitations period provided for *all* federal actions. There is a relatively clear majority rule that the statute of limitations provided in 28 U.S.C. § 2462 is not subject to the discovery rule. The seminal case interpreting § 2462 is *3M Co. v. Browner,* 17 F.3d 1453 (D.C. Cir. 1994). The *3M* Court explained that the underlying rationale of the discovery rule did not apply to cases in which the EPA sought penalties for violations of environmental laws:

> The rule EPA sponsors is of an entirely different sort. It is a "discovery of violation" rule having nothing whatever to do with the problem of latent injuries. The rationale underlying the discovery of injury rule-that a claim cannot realistically be said to accrue until the claimant has suffered harm-is completely inapposite.

*Id.* at 1460. The Court then rejected the argument that § 2462 should be interpreted in light of EPA's difficulties in enforcing the environmental law at issue. After a thorough review of case law, the *3M* Court concluded:

> we hold that an action, suit or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the

6

> violation giving rise to the penalty. We reject the discovery of
> violation rule EPA advocates as unworkable; outside the language of
> the statute; inconsistent with judicial interpretations of § 2462;
> unsupported by the discovery of injury rule adopted in
> non-enforcement, remedial cases; and incompatible with the functions
> served by a statute of limitations in penalty cases.

*Id.* at 1462-63.[6] *Accord Trawinski v. United Technologies,* 313 F.3d 1295, 1298 (11th Cir. 2002); *Federal Election Com'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996).

In *L.E.A.D.,* the Court reasoned that the discovery rule applicable for Clean Water Act claims should apply to Clean Air Act claims as well. The Court pointed to the similarly broad purposes of the Clean Air Act and the difficulty of detecting violations. In *Murphy Oil* (a Clean Air Act case), the Court disagreed:

> The reasoning in *L.E.A.D*. is not convincing. The court failed to take
> into account an important difference between the Clean Water Act
> and the Clean Air Act: unlike the Clean Air Act, the Clean Water Act
> contains a provision that imposes a duty on the source to self-report
> the effluent that it is discharging. *See* 33 U.S.C. § 1365(b)(1)(B). Only
> through these self-reports does the Environmental Protection Agency
> or the public learn of violations of the Clean Water Act. In *Public
> Interest*, 913 F.2d at 75, and *Material Service*, 1996 WL 563462 at
> *2-*3, the courts concluded that it made sense for the claim to accrue
> at the time the self-reports were filed because it is only at that moment
> that the public becomes aware that violations have occurred.

143 F. Supp.2d at 1084. In *Murphy Oil*, as here, the plaintiff had access to files and made on-site visits. This Court is persuaded by the rationales in *3M Co.* and *Murphy Oil*, and concludes that the discovery rule does not apply.

---

[6]The *3M* Court distinguished *Public Interest Research Group of New Jersey v. Powell Duffryn*, 913 F.2d 64, 75 (3d Cir.1990) (*"PIRG"*), as holding that the limitations period accrued when the company filed its discharge reports with EPA. *PIRG* reasoned that the public interest group plaintiff could not have known about the Clean Water Act violation at issue until the defendant filed its discharge report.

However, that does not conclude the analysis. In *Federal Election Com'n v. Williams*, the Court of Appeals for the Ninth Circuit held that the doctrine of equitable tolling is incorporated into every federal statute of limitations period. 104 F.3d at 240 (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). The *Williams* Court set forth a three-part test for when the limitations period in § 2462 would be tolled: (1) fraudulent conduct by the defendant resulting in concealment of the operative facts; (2) failure of the plaintiff to discover the operative facts that are the basis of its cause of action within the limitations period; and (3) due diligence by the plaintiff until discovery of those facts. *See also Murphy Oil,* 143 F. Supp.2d at 1085. In *Urcinoli v. Cathel*, --- F.3d ----, 2008 WL 4822247 (Nov. 7, 2008) (citations omitted), the Court of Appeals for the Third Circuit has recently articulated a similar test:

> A statute of limitations "can be tolled when principles of equity would make [its] rigid application unfair." Generally, such a situation arises if "(1) the defendant has actively misled the plaintiff; (2) if the plaintiff has in some extraordinary way been prevented from asserting his rights; or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." . . . The plaintiff bears the burden of showing that such an extraordinary event has stood in his way, and must also demonstrate that he "diligently pursued his rights."

This Court will apply the "equitable tolling" test set forth in *Urcinoli*.

Defendants contend that there are no genuine issues of material fact that would prevent the entry of summary judgment in their favor under this test. Plaintiffs argue, however, that Defendants did actively mislead them by disclosing certain projects, such as the installation of low NOx burners, but failing to inform them of other work that allegedly should have triggered the permitting requirements.[7] The equitable tolling test is very fact-intensive. Although Plaintiffs face

---

[7]Plaintiffs start from the premise that Defendants were required to obtain preconstruction
(continued...)

a difficult burden, the Court is reluctant to conclude on this record that Claims 1 and 7 are time-barred as a matter of law. In summary, Defendants' Objections to the conclusion in this part of the R&R will be denied. However, this Court will apply the "equitable tolling" test to the facts as developed at trial.

2. Projections of Significant Increases in Emissions

The Magistrate Judge concluded that material disputes of fact exist as to whether Defendants should have predicted significant increases in emissions. Plaintiffs contend that they are entitled to summary judgment on this issue. Defendants have not objected to this aspect of the R&R but have contested the methodology used by Plaintiff's expert witness.

The Clean Air Act contains provisions designed for the prevention of significant deterioration ("PSD") of air quality. The PSD provisions require existing major stationary sources of air pollution, such as the power plants owned and operated by Defendants, to undergo a pre-construction permitting process before performing certain "major modifications." The implementing regulations define the term "major modification" to mean: "any physical change in or change in the method of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i).[8] For the

---

[7](...continued)
permits for the work at issue. However, this premise would conflate the calculation of the limitations period with the parties' success on the merits.

[8]RMRR and "an increase in the hours of operation or in the production rate" are excluded. 40 C.F.R. § 52.21(b)(2)(iii)(a), (f). All quotations are from the regulation as it read prior to revisions in 2002 that are not applicable to this proceeding.

9

pollutants at issue here, NOx and $SO_2$, a net emissions increase of 40 tons per year is deemed to be "significant." 40 C.F.R. § 52.21(b)(23)(i).

The regulations outline a two-step process for predicting the effect of a project upon future emissions, by which the net emissions increase equals the sum of: (1) any increase in actual emissions from a particular change; and (2) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change (i.e., netting). 40 C.F.R. § 52.21(b)(3)(i). The regulations define the term "actual emissions" as follows:

> Actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

40 C.F.R. § 52.21(b)(21)(ii). Unfortunately, the regulations do not provide sufficiently detailed guidance as to the methodology to be used in calculating the projected actual emissions to resolve the disputes in this case.

In *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir.1990) ("WEPCO"), the Court held that the EPA should measure future emissions based on a projection of future actual emissions. This has become known as the "actual-to-projected-actual" test. Subsequently, the EPA issued a Final Rule (the "WEPCO Rule") in which it agreed to adopt this approach for the utility industry. 57 Fed. Reg. 32314 (July 21, 1992). The WEPCO Rule further explained that "the Administrator would presume that any 2 consecutive years within the 5 years prior to the proposed

change is representative of normal source operations for a utility." *Id.* at 32,323. The Rule provided a formula for projecting emissions:

> The future actual projection is the product of: (1) The hourly emissions rate, which is based on the unit's physical and operational capabilities following the change and federally-enforceable operational restrictions that would affect the hourly emissions rate following this change; and (2) projected capacity utilization, which is based on (a) the unit's historical annual utilization, and (b) all available information regarding the unit's likely post-change capacity utilization.

The projection of post-change capacity utilization should be based on a projection of utilization for the two years after the change. *Id.* EPA noted that "in projecting future utilization and emissions factors, the permitting authority may consider the company's historical operational data, its own representations, filings with Federal, State or local regulatory authorities, and compliance plans developed under title IV of the 1990 Amendments." *Id.* n.19. Because the definition of "major modification" contains a causation element, utilities may exclude from their emissions projection "that portion of the increased rate of utilization, if any, due to factors unrelated to the physical or operational change," such as demand growth. *Id.* at 32,326.

The gravamen of Plaintiffs' claims is that Defendants should have predicted that the work they performed would lead to significant emissions increases, which would trigger the permitting requirements. In support of their theory, Plaintiffs have submitted the expert report and rebuttal report of Dr. Richard A. Rosen. Defendants have countered with an expert report from Frank C. Graves, which criticizes the methodology utilized by Dr. Rosen. The Magistrate Judge concluded that the battle of experts precludes the entry of summary judgment, but did not thoroughly analyze the methodology to be employed at trial.

11

As an initial matter, the regulations require utilities to make predictions of future events. As explained in *United States v. Southern Indiana Gas and Electric Co. (SIGECO)*, 2002 WL 1760752 *4-6 (S.D. Ind. 2002), the regulatory requirements are framed in terms of what utilities must do before commencing construction. Accordingly, Defendants' duty was "not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will cause." *Cynergy*, 458 F.3d at 709; *Ohio Edison*, 276 F. Supp.2d at 863. In other words, Defendants were required to make a reasonable projection, in advance, of whether the projects would result in an increase of more than 40 tons per year of $SO_2$ or NOx. It is Plaintiffs' burden to prove that each of Defendants' projects constituted a major modification. *United States v. Eastern Kentucky Power Co.*, 498 F. Supp.2d 995 (E.D. Ky. 2007); *Sierra Club v. Morgan*, 2007 WL 3287850 *12 (W.D. Wis. 2007).

The Court will not address all of Defendants' specific criticisms of Dr. Rosen's methodology at this time.[9] Even assuming, arguendo, the internal validity of Dr. Rosen's methodology, the Court has a more fundamental concern regarding Plaintiffs' approach, namely, that it does not answer the correct question. The focus must be on the conduct and methodology used by Defendants at the time of the projects.[10] Plaintiffs conceded at oral argument that the

---

[9]Defendants have indicated their intent to file a *Daubert* motion and the Court will reserve ruling until both sides have been fully heard.

[10]It is apparently undisputed that Defendants did not perform thorough pre-construction emissions projections. Graves stated: "Unfortunately, the ideal retrospective analysis is not feasible in this instance, as no unit-level generation and/or emissions projections exist from the relevant timeframes." Graves Report at 8. The record reflects that as to the Armstrong Nos. 1 and 2 boiler projects, J.L. Mooney drafted a memo that opined in part that "boiler efficiency will increase 4.5%, and the availability is estimated to increase by 4.6%. The net result of these two factors is very close to zero net change." Plaintiffs' Exhibit 18. Graves describes this memo as a

(continued...)

methodology that Dr. Rosen used was not the only acceptable methodology for making emissions projections.[11] The regulations in place at the time did not put the utilities on notice that they were required to use Dr. Rosen's methodology, or any particular methodology.[12] Thus, even if Dr. Rosen's retrospective methodology demonstrates that Allegheny ***might*** have projected a significant net increase, Dr. Rosen's opinion is insufficient to establish that ***all*** reasonable methodologies ***must*** have projected a significant net increase such that Defendants' failure to obtain a permit at the time was unreasonable.

        This flaw is perhaps illustrated most clearly in Plaintiffs' approach to the "baseline" of pre-project emissions. Dr. Rosen determined the baseline by identifying "the sequential 24-month period that most closely yielded 24 months of the average actual monthly emissions of the

---

[10](...continued)
"screening analysis." Dr. Rosen explained that "heat rate improvements make the unit more efficient by reducing the amount of fuel used to generate a fixed amount of electricity." Rosen Report at 21. Although Dr. Rosen considered possible anticipated changes in heat rate, "ultimately, [he] did not allow such projections to have an effect on [his] emissions calculations here." *Id.* Plaintiffs have not provided evidence as to whether Defendants' projection of a 4.5% efficiency increase was reasonable.
    As to the Hatfield Unit 2 Project that is currently at issue in the parties' Objections, there is not even this level of detail. Engineer Clark Colby stated in his deposition: "We didn't do a formal analysis, but in passing you would have done a sanity check, just ... in your head." DX 146 at 54. Colby explained that no calculation was performed because based on "common engineering knowledge, you weren't going to effect any of those parameters." *Id.* at 55.

[11]Dr. Rosen's report identified three possible methods: (1) analysis of GADS data; (2) analyis of statements made in internal engineering documents; and (3) analysis of Defendants' own forecasts. Dr. Rosen concluded that the internal documentation was either not available or far too fragmentary. Rosen Report at 3.

[12]Applying Dr. Rosen's methodology retroactively would raise substantial concerns regarding the "fair warning doctrine." *See General Electric Corp. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995) (explaining the due process concerns that arise when EPA uses an enforcement action as the means of announcing its interpretation of a regulation).

five-year period." Rosen Report at 27. However, it is undisputed that utilities generally have the option of selecting *any* two year period during the prior five years as the baseline. *See Ohio Edison*, 276 F. Supp.2d at 863-64; WEPCO Rule. Obviously, the utilities have an incentive to choose the "high two" years to establish the emissions baseline. Plaintiffs have not introduced evidence as to whether use of a "high two" baseline by Defendants would have been reasonable for the projects at issue in this case. Similarly, Plaintiffs have not provided calculations of projected emissions increases that utilize a "high two" baseline. In his rebuttal report, Dr. Rosen acknowledged that EPA initially presumes that any two consecutive-year period might be used, but then explained why "my choice is clearly ***allowable***." Rosen Rebuttal Report at 2 (Emphasis added). Indeed, the Conclusion in Dr. Rosen's Rebuttal Report states: "the emissions increases that I forecast were ***possible***." (Emphasis added). The question before this Court, however, is ***not*** whether Dr. Rosen's retrospective methodology is "allowable" or "possible," but rather, whether Defendants' prediction that they did not need a permit was "reasonable" under the circumstances existing at the time. In sum, Dr. Rosen's report is not sufficient to answer the question presented to the Court. Thus, Plaintiffs have failed to meet their burden and the R&R correctly determined that they are not entitled to summary judgment on Claims 17 and 18.

The R&R stated that as to the 1999 Hatfield Project, "plaintiffs rely solely on Dr. Rosen's opinions and methodology." R&R at 26-27. It may be that all of the Claims are equally dependent upon Dr. Rosen. On the other hand, Plaintiffs may have additional evidence and/or actual post-project emissions data[13] which may support a finding that Defendants' failure to obtain a

---

[13]For example, DX162 appears to show that annual emissions of $SO_2$ increased by 5,489 tons after the 1999 Hatfield Project.

14

permit before undertaking one or more of the projects was unreasonable. The Court solicits the parties' input on this matter as part of their pretrial filings.

In summary, the Court will affirm the R&R on this issue and Plaintiffs' objection thereto will be denied. Magistrate Judge Mitchell recognized that this inquiry involves a fact-dependent determination that must be resolved on a case-by-case basis and that issues of material fact exist as to whether Defendants should have projected significant emissions increases as a result of the 1999 Hatfield Project. R&R at 29. Plaintiffs have not established, as a matter of law, that the work constituted a "major modification." Dr. Rosen's opinion that Defendants *might* have projected significant emissions increases by using his methodology will not suffice. It is important to recognize that this case is a post-hoc enforcement action that seeks remedies for actions that Defendants allegedly failed to take. As explained above, the focus at trial will be on the reasonableness of the actions taken and predictions made by Defendants at the time decisions were made regarding the projects at issue.

### 3. Routine Maintenance, Repair and Replacement ("RMRR")

Both parties object to portions of the analysis in the R&R of the RMRR exclusion. The term "major modification" is defined at 40 C.F.R. § 52.21(b)(2)(iii)(a) to exclude physical or operational changes that constitute "routine maintenance, repair and replacement." The parties agree that there is a four-factor test to determine whether a project falls within the RMRR exclusion: (1) a project's nature and extent; (2) its purpose; (3) its frequency; and (4) its cost, and that no single factor is dispositive. *WEPCO*, 893 F.2d at 910-13. The parties disagree as to whether the "frequency" factor should be determined under the "routine in the industry" or "routine at the unit"

standard. In addition, the parties disagree as to whether the "cost" factor should be evaluated in terms of actual or relative cost. Finally, they dispute how the applicable test should be applied to the facts of this case.

The Magistrate Judge thoroughly analyzed the two competing lines of cases and the prior interpretations of the EPA in explaining why the "routine in the industry" test should be applied. R&R at 7-13. The Court adopts this portion of the R&R. Notably, in the WEPCO Rule, EPA stated that the RMRR analysis "must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category." 57 Fed. Reg. at 32,326. The Plaintiffs may be able to apply the narrower "routine at the unit" test prospectively, but it may not be fair to impose that test in the context of this litigation to the actions taken by Defendants at the time. *See General Electric*, 53 F.3d at 1329.[14]

The R&R explained that neither side had met its burden to demonstrate that the RMRR exception applied in its favor as a matter of law. The Court agrees with the Magistrate Judge. The EPA has always described a fact-intensive, case-by-case, multi-factor, common-sense determination. 67 Fed.Reg. 80,290, 80,292-93 (Dec. 31, 2002). In particular, Defendants' Objections seem to be focused on the "frequency" factor to the exclusion of the other three factors. Thus, summary judgment is not appropriate unless no reasonable factfinder could find in favor of the non-moving party.

To aid in trial preparation for the parties, the Court makes the following observations. In keeping with the regulatory guidance, the Court will consider a wide range of

---

[14]The Court does not reach the "fair warning doctrine" issue in the RMRR context, and notes that *Ohio Edison*, 276 F. Supp.2d at 885-889, and *United States v. SIGECO*, 245 F. Supp.2d 994 (S.D. Ind. 2003), concluded that the doctrine did not apply under the facts of those cases.

evidence. The Court does not perceive a dramatic distinction between the "routine at the unit" and "routine in the industry" tests in application, and evidence regarding both measures will be considered at trial. The "extent" and "cost" factors will be considered in both actual and relative terms. The accounting treatment of the projects will be considered but will not be dispositive. The Court finds as plausible Defendant's argument that entire sections of the lower slope hopper were replaced at once, rather than as individual tubes, because of the difficulty of accessing that area of the boiler, and will consider such evidence and Plaintiffs' response thereto in evaluating "nature and extent." As noted above, in this retroactive enforcement action the focus must be on whether Defendants' interpretation of the applicable RMRR test was reasonable at the time. It is not fair to impute subsequent case law to Defendants' knowledge at the time. In summary, the application of the RMRR exclusion cannot be decided as a matter of law on this record and both parties' Objections to the R&R will be denied.

**Conclusion**

For all of the above reasons, the Court will AFFIRM IN PART AND MODIFY IN PART the September 2, 2008 R&R issued by Magistrate Judge Mitchell. Except as set forth above, the R&R is adopted as the opinion of this Court.

AND NOW, this 18th day of November, 2008, it is hereby ORDERED, ADJUDGED AND DECREED that DEFENDANTS' RULE 72(B) OBJECTIONS TO THE SEPTEMBER 2, 2008 REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (Document No. 223) and PLAINTIFFS' RULE 72(B) OBJECTIONS TO MAGISTRATE JUDGE MITCHELL'S

REPORT & RECOMMENDATION CONCERNING THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT (Document No. 224) are **DENIED.**

(1) Plaintiff's Pretrial Narrative Statement shall be filed on or before December 18, 2008.

(2) Defendant's Pretrial Narrative Statement shall be filed on or before January 19, 2009.

(3) Material facts not identified in the pretrial narrative statements may be excluded upon objection or sua sponte. Witnesses or exhibits not identified in the pretrial narrative statements shall not be admissible at trial, except an exhibit to be used solely for impeachment or rebuttal purposes.

(4) The parties shall each set forth anticipated legal and/or evidentiary issues which may be the subject of pretrial motions.

(5) The parties shall not amend or supplement their pretrial narrative statements without leave of Court upon good cause shown.

(6) The Court shall schedule a pretrial conference following receipt of the pretrial narrative statements. Counsel shall instruct their clients or principals to attend or be available by telephone to facilitate the amicable resolution of the litigation. **Trial counsel must attend.**

(7) The parties shall also confer with regard to compromise and settlement of this action. The parties shall meet and confer in advance of the conference in an effort to identify (and if possible, resolve) procedural issues with regard to the trial of this case. Each party is directed to provide the Judge with a Certificate of Compliance setting forth the parties' settlement demand or offer, as the case may be, on or before four days prior to the pretrial conference.

                                                  BY THE COURT:

                                                  s/Terrence F. McVerry
                                                  United States District Court Judge

cc:             Magistrate Judge Robert C. Mitchell

Jose A. Suarez,
Office of the Attorney General, Connecticut
Email: jose.suarez@po.state.ct.us

Kimberly Massicotte
Office of the Attorney General, Connecticut
Email: kimberly.massicotte@po.state.ct.us

Lori D. Dibella
Office of the Attorney General, Connecticut
Email: lori.dibella@po.state.ct.us

Judah Prero,
Office of the Attorney General, Maryland
Email: jprero@oag.state.md.us

Kathy M. Kinsey
Office of the Attorney General, Maryland
Email: kkinsey@mde.state.md.us

Susan F. Martielli
Office of the Attorney General, Maryland
Email: smartielli@mde.state.md.us

Kevin Auerbacher
Office of the Attorney general, New Jersey
Email: Kevin.auerbacher@dol.lps.state.nj.us

Lisa J. Morelli
Office of the Attorney general, New Jersey
Email: lisa.morelli@dol.lps.state.nj.us

Andrew G. Frank
New York State, Office of the Attorney General
Email: andrew.frank@oag.state.ny.us

Jacob E. Hollinger
New York State, Office of the Attorney General
Email: Jacob.Hollinger@oag.state.ny.us

Marianne Mulroy
Pennsylvania Dept of Environmental Protection

Email: mmulroy@state.pa.us
Robert A. Reiley
Department of Environmental Protection
Email: rreiley@state.pa.us

Steven F. Baicker-McKee
Babst, Calland, Clements & Zomnir
Email: sbaicker@bccz.com

Alan B. Rosenthal
Babst, Calland, Clements & Zomnir
Email: arosenthal@bccz.com

Nash E Long, III
Hunton & Williams, LLP
Email: nlong@hunton.com

T. Thomas Cottingham, III
Hunton & Williams LLP
Email: tcottingham@hunton.com